# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

### INFORMAL BRIEF OF APPELLANT

Case Number: 2025 - 1379

Short Case Caption: Chae vs US

Name of Appellant: Byungmin Chae

**Instructions:** Read the Guide for Unrepresented Parties before completing this form. Answer the questions as best as you can. Attach additional pages as needed to answer the questions. This form and continuation pages may not exceed 30 pages.

Attach a copy of the trial court's opinion, order, and/or judgment. You may also attach other record material as an appendix. Any attached material should be referenced in answer to the below questions. Please redact (erase, cover, or otherwise make unreadable) social security numbers or comparable private personal identifiers that appear in any attachments you submit.

1. Have you ever had another case before this court?  ☑ Yes  ☐ No
   If yes, state the name and number of each case.

   > Chae vs Yellen (22- 2017)

2. Did the trial court incorrectly decide or fail to take into account any facts?
   ☑ Yes  ☐ No
   If yes, what facts?

   > ① The court of International Trade failed to consider the defendant's negligence to comply with the court's deadline (8/13/24)
   > ② There was a case of warrantless search of the mail packages which was "unconstitutional" in the court ruling.

3. Did the trial court apply the wrong law? ☐ Yes ☑ No

   If yes, what law should be applied?

4. Did the trial court fail to consider important grounds for relief?

   ☑ Yes ☐ No

   If yes, what grounds?

   The Court should consider the case ruling of "Baxter I" and at the time of my exam it was legally effective by the Constitution 4th amendment that the warrantless search of the mail packages was "unlawful"

5. Are there other reasons why the trial court's decision was wrong?

   ☐ Yes ☑ No

   If yes, what reasons?

6. What action do you want this court to take in this case?

please take the paper document #3 on Pending review in 25-1379 docket statement for "the brief", Thanks.

Date: 3/24/25

Signature: Byungmin Chae

Name: Byungmin Chae

Greetings,

I hope this letter finds you well

In the reference to the analysis noted on page 9 from the court of international trade dated on November 13, 2024 in the case 1:24-cv-00086-TMR I would like to follow up with the court that the focus of the judge Reif's inquiry and ultimately upholding the Res Judicata, was his impression that there was no developments that took place since my initial filing, and therefore no exceptions to the res judicata. Specifically, shortly after I took the exam, which was April, 2018, US v Baxter (Baxter I) law was in place, which held that the fourth amendment prohibits warrantless examination of "the packages at issue here were mailed from the mainland to the Virgin Island". They never left the United States territory. Unless some other legally transformative even occurred, warrantless search of the priority mail packages here would be unconstitutional". See attached Baxter I, which was decided in November 2018.   This in turn, one may argue, would invalidate 19 CFR § 145.2 under Fourth amendment.   The case was overruled in Baxter II by the 3rd circuit in late February 2020, which was in close proximity to my initial filing of Chae v. Yellen (filed in September 2020). Baxter II is also attached.   After Baxter II in April 2020, USVI bar association filed amicus expressing their outrage of Baxter II holding. Please see Baxter Amicus.   Uncertainty of Baxter decision lasted up in the air all the way until January 2021 – well into my original litigation – when the Certiorari was denied and Baxter II became the final law.   See attached Baxter docket.

The foregoing means that my exam took place when Baxter I was in effect, which held mail merchandise in priority mail packages CBP's warrantless searches are as unconstitutional, i.e. treatment of USVI to NY should be the same as one of CA to NY.   This means that under Baxter I, CBP should not have examined the merchandise. But now new development, here Baxter II, showed that warrantless exam is ok.   I think that at the time of my exam I was following Baxter I but around the time of CIT filing the law changed to Baxter II and that was something new, something which res judicata doctrine should be except.

Thanks for your time and reading

Sincerely,

Byungmin Chae

Slip Op. 24-126

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| **BYUNGMIN CHAE,** | |
| Plaintiff, | |
| v. | Before: Timothy M. Reif, Judge |
| **UNITED STATES,** | Court No. 24-00086 |
| Defendant. | |

## <u>OPINION</u>

[Granting defendant's motion to dismiss for failure to state a claim in challenge to customs broker's license denial.]

Dated: November 13, 2024

<u>Byungmin Chae</u>, plaintiff, of Omaha, Nebraska, proceeding pro se.

<u>Marcella Powell</u>, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of New York, N.Y., argued for defendant United States. With her on the brief were <u>Brian M. Boynton</u>, Principal Deputy Assistant Attorney General, <u>Patricia M. McCarthy</u>, Director, <u>Aimee Lee</u>, Assistant Director and <u>Justin R. Miller</u>, Attorney-in-Charge, International Trade Field Office. Of counsel on the brief was <u>Yelena Slepak</u>, Office of the Assistant Chief Counsel, International Trade Litigation, U.S. Customs and Border Protection.

Reif, Judge: Before the court is the motion to dismiss of defendant United States ("defendant"). Def.'s Mot. to Dismiss ("Def. Br."), ECF No. 7.

Plaintiff Byungmin Chae ("plaintiff") filed his second action with this Court to challenge the denial by U.S. Customs and Border Protection ("Customs") of credit for plaintiff's answer to Question No. 27 on the April 2018 Customs Broker License Exam (CBLE). Pl.'s Complaint ("Compl.") at 1, ECF No. 2. To obtain a license, section 641(b) of the Tariff Act of 1930, 19 U.S.C. § 1641(b)(2), requires that applicants take the CBLE

to demonstrate their knowledge of U.S. customs laws and regulations.[1]  A passing score

of 75 percent or more is one prerequisite to becoming a licensed broker.[2]  19 U.S.C. §

1641(f) (granting authority to the Secretary of the Treasury to "establish rules and

regulations governing" licensing of customs brokers); 19 C.F.R. § 111.11(a)(4) (requiring

a score of 75 percent or higher to pass the CBLE).  A 75 percent score entails that

applicants must answer 60 or more questions correctly out of 80.

        Broker license applicants who are dissatisfied with their exam scores may file an

appeal first to the Broker Management Branch ("BMB") of Customs and then to

Customs' Executive Assistant Commissioner ("Commissioner").  19 C.F.R. § 111.13(f).

Applicants may further file for judicial review by the U.S. Court of International Trade

(the "Court" or "USCIT") within 60 days of the final agency decision.  19 U.S.C. §

1641(e)(1) (outlining the procedure for appealing decisions by the Secretary of the

Treasury on license and permit denials or revocations); 28 U.S.C. § 2636(g) (setting

time limits for contesting the Secretary's decisions).

        On the April 2018 CBLE, plaintiff received a score of 65 percent and

subsequently filed an appeal with the BMB.  *Chae v. Sec'y of the Treasury*, 45 CIT __,

__, 518 F. Supp. 3d 1383, 1390 (2021); 19 C.F.R. § 111.13(f).  The BMB reviewed

plaintiff's appeal and awarded plaintiff credit for two out of the thirteen questions

reviewed, which raised plaintiff's score to 67.5 percent.  *Chae*, 45 CIT at __, 518 F.

---

[1] Further citations to the Tariff Act of 1930, as amended, are to the relevant portions of
Title 19 of the U.S. Code, 2018 edition.

[2] Applicants who do not meet the score threshold may retake the exam without penalty.
19 C.F.R. § 111.13(e).  Plaintiff acknowledges the opportunity to retake but states that
the process would create an "additional financial burden" and "take additional time to
prepare."  Teleconference Transcript at 14:12-25, 15:1, ECF No. 13.

Supp. 3d at 1390. However, plaintiff's score remained below the minimum passing

grade. *Id.* On September 28, 2018, plaintiff requested review by the Commissioner of

the BMB decision with respect to 11 questions. *Id.* The Commissioner granted credit

for three more questions and recalculated plaintiff's score to 71.25 percent. *Id.* In a

letter dated May 23, 2019, the Commissioner informed plaintiff that his score

nonetheless remained insufficient and denied plaintiff's application for a license. *Id.* at

__, 518 F. Supp. 3d at 1391.

On March 4, 2020, plaintiff brought his first action to contest the decision of

Customs to deny plaintiff's application for a customs broker license. *Id.* at __, 518 F.

Supp. 3d at 1390. Customs had justified its denial by noting plaintiff's insufficient score

on the April 2018 CBLE. *Chae v. Yellen*, 46 CIT __, __, 579 F. Supp. 3d 1343, 1343

(2022); *see Kenny v. Snow*, 401 F.3d 1359, 1362 (Fed. Cir. 2005) (finding that a failure

to achieve a passing score justified denial of a license application). Plaintiff challenged

Customs' decision and sought a ruling that he was entitled to credit for several exam

questions. *Chae*, 46 CIT at __, 579 F. Supp. 3d at 1348. Defendant moved to dismiss

for lack of subject matter jurisdiction, arguing that plaintiff filed his complaint after the

statute of limitations had expired.[3] *Chae*, 45 CIT at __, 518 F. Supp. 3d at 1389. The

Court denied defendant's motion and granted plaintiff leave to amend his complaint and

summons.[4] *Id.* at __, 518 F. Supp. 3d at 1392. Plaintiff's amended request challenged

---

[3] Defendant also asserted that plaintiff failed to meet procedural requirements for filing a summons and complaint. *Chae*, 45 CIT at __, 518 F. Supp. 3d at 1389.

[4] The Court concluded that circumstances permitted equitable tolling of plaintiff's filing period. *Id.* at __, 518 F. Supp. 3d at 1389-1392. The Court then granted plaintiff 60 days to amend his complaint in accordance with USCIT Rule 10(a). *Id.*

five CBLE questions (Question Nos. 5, 27, 33, 39 and 57). *Chae*, 46 CIT at __, 579 F.

Supp. 3d at 1353.

On June 6, 2022, this Court held that Customs' denial of credit for four of the five

contested questions (Question Nos. 5, 27, 33 and 39) was supported by substantial

evidence. *Id.* at __, 579 F. Supp. 3d at 1372. The Court determined that Customs'

decision to deny credit for Question No. 57, however, was not. *Id.* Despite the credit

adjustment, plaintiff's score was 72.5 percent and still below the passing requirement.

*Id.* at __, 579 F. Supp. 3d at 1370-71. The Court denied plaintiff's motion for judgment

on the agency record and concluded that Customs' decision to reject plaintiff's

application for a customs broker's license was not "arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law." *Id.* (quoting 5 U.S.C. § 706(2)(A)).

The Court then issued judgment for defendant. *Id.* at __, 579 F. Supp. 3d at 1372.

On July 13, 2022, plaintiff appealed to the U.S. Court of Appeals for the Federal

Circuit ("Federal Circuit") this Court's decision to sustain Customs' denial of credit for

Question Nos. 5, 27 and 33 on the CBLE. *Chae v. Yellen*, 2023 WL 3072385, at *2

(Fed. Cir. Apr. 25, 2023). On April 25, 2023, the Federal Circuit affirmed this Court's

decision as to Question Nos. 27 and 33 but found that Customs' denial of credit for

Question No. 5 was not supported by substantial evidence. *Id.* at *7. As a result,

plaintiff's score rose to 73.75 percent, but stayed below the minimum 75 percent. *Id.*

The Federal Circuit accordingly upheld this Court's judgment that Customs was justified

in denying plaintiff a license due to an insufficient score. *Id.* (citing *Kenny*, 401 F.3d at

1361).

On June 24, 2023, plaintiff filed a petition for a writ of certiorari with the Supreme

Court seeking review of the Federal Circuit's decision. *See Chae v. Yellen*, 144 S. Ct.

347 (2023). On October 23, 2023, the Supreme Court denied plaintiff's request. *Id.* On

January 22, 2024, the Supreme Court also rejected plaintiff's subsequent request for a

rehearing. *Chae*, 46 CIT at __, 579 F. Supp. 3d at 1372, *aff'd*, 2023 WL 3072385 (Fed.

Cir. Apr. 25, 2023), *cert. denied*, 144 S. Ct. 347 (Oct. 30, 2023), *reh'g denied*, 144 S. Ct.

714 (Jan. 22, 2024) ("*Chae I*").

On May 8, 2024, plaintiff commenced the instant action with this Court. *See*

Compl. at 1. Plaintiff contended that Customs' denial of credit for Question No. 27 was

improper given that a vague term in 19 C.F.R. § 145.2 rendered Question No. 27 a

faulty question. *Id.* On July 22, 2024, defendant moved to dismiss plaintiff's action

under USCIT Rule 12(b)(6), arguing that claim preclusion barred plaintiff from bringing

suit. Def. Br. at 6-7.[5]

For the following reasons, the court grants defendant's motion to dismiss.

### JURISDICTION AND STANDARD OF REVIEW

The court maintains exclusive jurisdiction to review "any decision of the Secretary

of the Treasury to deny a customs broker's license under section 641(b)(2) or (3) of the

Tariff Act of 1930." 28 U.S.C. § 1581(g)(1); 19 U.S.C. § 1641(e).

---

[5] In a letter dated August 7, 2024, plaintiff filed an opposition to defendant's motion to
dismiss. Pl.'s Resp. to Def.'s Mot. to Dismiss ("Pl. Letter"), ECF No. 11. On August 30,
2024, defendant filed its reply, reiterating that plaintiff had the "opportunity to present
arguments in its motion for judgment on the agency record and at oral argument on that
motion . . . [and] the opportunity to present arguments in support of his Federal Circuit
appeal." Def.'s Reply Br. ("Def. Reply Br.") at 4-5, ECF No. 14.

"A court may properly dismiss a claim pursuant to Rule 12(b)(6) only if Plaintiffs' allegations of fact are not 'enough to raise a right to relief above the speculative level.'" *VoestAlpine USA Corp. v. United States*, 46 CIT __, __, 578 F. Supp. 3d 1263, 1276 (2022) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Courts consider allegations within the complaint along with other "matters incorporated by reference or integral to the claim, items subject to judicial notice, [and] matters of public record." *A & D Auto Sales, Inc. v. United States*, 748 F.3d 1142, 1147 (Fed. Cir. 2014) (alteration in original) (quoting 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 (3d ed. 2004)).

"The court may decide to dismiss an action for failure to state a claim if the claim is barred by the doctrine of claim preclusion." *United States Steel Corp. v. United States*, 42 CIT __, __, 319 F. Supp. 3d 1295, 1300 (2018) (citing *Bowers Inv. Co. v. United States*, 695 F.3d 1380, 1384 (Fed. Cir. 2012)).

## DISCUSSION

The court considers whether plaintiff's claim is barred by claim preclusion. Because plaintiff's arguments in the instant action could have been raised in *Chae I*, the court answers yes. Plaintiff is barred from bringing the instant action.

**I.    Whether plaintiff's claim is barred under the doctrine of claim preclusion**

    **A.    Legal framework**

Under the doctrine of claim preclusion, "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Allen v. McCurry*, 449 U.S. 90, 94 (1980) (citing *Cromwell v. Cnty. of Sac*, 94 U.S. 351, 352 (1876)); *Brown v. Felsen*, 442 U.S. 127, 131 (1979)

("Res judicata prevents litigation of all grounds for, or defenses to, recovery that were previously available to the parties, regardless of whether they were asserted or determined in the prior proceeding."); *see also Golden Pac. Bancorp. v. United States*, 15 F.3d 1066, 1071 (Fed. Cir. 1994). The party asserting claim preclusion is required to show that: (1) the parties in both suits are identical; (2) the first suit reached a final judgment on the merits; and (3) the second suit is based on the same set of transactional facts as in the first suit. *Jet, Inc. v. Sewage Aeration Sys.*, 223 F.3d 1360, 1362 (Fed. Cir. 2000) (citing *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 n.5 (1979)); *see also Young Eng'rs, Inc. v. U.S. Int'l Trade Comm'n*, 721 F.2d 1305, 1314 (Fed. Cir. 1983) (citing Restatement (Second) of Judgments § 13 (1982)); *Apotex, Inc. v. FDA*, 393 F.3d 210, 217 (D.C. Cir. 2004) ("[A] judgment on the merits in a prior suit bars a second suit involving identical parties . . . based on the same cause of action.").

A transaction is characterized as having "the same, or nearly the same factual allegations" or "the same nucleus of operative facts." *Herrmann v. Cencom Cable Assocs., Inc.*, 999 F.2d 223, 226 (7th Cir. 1993) (first quoting *Parsons Steel, Inc. v. First Ala. Bank,* 474 U.S. 518, 521 (1986); and then quoting *Lane v. Peterson*, 899 F.2d 737, 744 (8th Cir. 1990)). By contrast, new events or facts arising after the first suit are not part of the same "operative nucleus of facts."[6] *Ammex, Inc. v. United States*, 334 F.3d 1052, 1057 (2003) (citing *Herrmann*, 999 F.2d at 226); *see also E.I du Pont de Nemours & Co. v. United States*, 32 CIT 476, 489, 561 F. Supp. 2d 1320, 1331 (2008) (explaining

---

[6] Similarly, claim preclusion does not bar claims that could not have been anticipated when the first suit was filed or "would have been utterly impracticable" to raise at the time. *U.S. Indus., Inc. v. Blake Const. Co.*, 765 F.2d 195, 205 n.21 (D.C. Cir. 1985); *see also Apotex*, 393 F.3d at 212 (acknowledging how "there has been no intervening change in the law[,] and there have been no material changes in the facts").

that claim preclusion did not apply because the first suit concerned "a judicial challenge

to a different administrative determination by Customs" than in the second suit).

## B.    Analysis

The court asks whether the proceedings in *Chae I* bar plaintiff from making his

current claim in this court.  Plaintiff insists that he is not barred by claim preclusion on

the basis that his current claim as to Question No. 27 differs from his previous claim.

Compl. at 2; *see* Pl. Letter.  Specifically, he highlights a perceived ambiguity in 19 C.F.R.

§ 145.2 and its definition of the term "Customs territory," a point not raised in *Chae I*.  Pl.

Letter.  Plaintiff asserts that the regulation's vagueness resulted in an incorrect

assessment of Question No. 27, and, therefore, he is due credit for the question.  *Id.*

Defendant contends that the three elements of claim preclusion are satisfied.

Def. Br. at 8.  Specifically, defendant asserts that the parties involved in the present

action and in *Chae I* are identical and that the claim under consideration here matches

plaintiff's claim in *Chae I*.  *Id.* (citing *Smalls v. United States*, 471 F.3d 186, 192 (D.C.

Cir. 2006)); *see also Parklane Hosiery Co.*, 439 U.S. at 326 n.5.  Defendant notes

additionally that this Court issued a final judgment in plaintiff's first action.  *Id.*

Plaintiff is foreclosed from bringing the instant action because each element of

claim preclusion is satisfied.  First, the parties in *Chae I* and the instant case are

identical.  Second, this Court issued a final judgment on the merits in plaintiff's first

action, and the Federal Circuit affirmed that judgment.  *See Chae I*, 46 CIT at __, 579 F.

Supp. 3d at 1372.  Third, the instant action is "based on the same set of transactional

facts" as plaintiff's first suit.  *Ammex, Inc.*, 334 F.3d at 1055.  Plaintiff's first action

concerned Customs' decision to deny plaintiff credit for his answer to Question No. 27 of

Court No. 24-00086

the April 2018 CBLE. *Chae I*, 46 CIT at __, 579 F. Supp. 3d at 1358-61.  Here, plaintiff

once again contests the same Customs decision to deny him credit for his answer to

Question No. 27 on the same exam.  Compl. at 3; *see E.I. du Pont de Nemours & Co.*,

32 CIT at 489, 561 F. Supp. 2d at 1331.  Plaintiff does not provide to the court any new

facts that arose after his initial action reached a final judgment.  Plaintiff only

supplements his earlier arguments in *Chae I.*

Plaintiff rebuts that he "was not seeking to relitigate the claim challenging CBP's

decision on Question No. 27." Pl. Letter at 1.  Plaintiff asserts instead that the

definitions of "Customs territory" in 19 C.F.R. § 145.2(b) and 19 C.F.R. § 101.1 create a

"discrepancy," and lead the plaintiff to "believe in the vulnerability of the regulation." *Id.*;

Compl. at 1.  Plaintiff asserts for this reason that the question's fault warrants awarding

him the credit.  Pl. Letter at 1.

Plaintiff's position is unsupported.  Plaintiff here simply presents an additional

reason that he should have been awarded credit for the same question that was the

subject of *Chae I*.  The claim in *Chae I* and the present claim share the identical

objective of obtaining credit for Question No. 27 and achieving a 75 percent score on

the CBLE.  *See Chae I*, 46 CIT at __, 579 F. Supp. 3d at 1358-61.  Plaintiff already

received a final judgment from this Court and the Federal Circuit's affirmation of that

judgment. *Id.*

Additionally, plaintiff had the opportunity to address his purported confusion

regarding "Customs territory" while he challenged the same regulation in *Chae I*. *See*

*Allen*, 449 U.S. at 94 ("[A] final judgment on the merits of an action precludes the parties

or their privies from relitigating issues that were or could have been raised in that

Case 1:24-cv-00086-TMR   Document 19   Filed 01/22/25   Page 12 of 63
Case 1:24-cv-00086-TMR   Document 15   Filed 11/13/24   Page 10 of 10

Court No. 24-00086                                                  Page 10

action." (citation omitted)); *see also Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 398 (1981).  Plaintiff contested the same regulation — 19 C.F.R. § 145.2 — but disputed a term different from the one at issue now.[7]  *See Chae I*, 46 CIT at __, 579 F. Supp. 3d at 1359.  Plaintiff is not entitled to an ongoing forum after a final judgment has been made in this Court.

In sum, the instant action is barred due to the doctrine of claim preclusion. Plaintiff has no valid claim to present, and the court in turn grants defendant's motion to dismiss for failure to state a claim.

## CONCLUSION

Based on the foregoing reasons, the court grants defendant's motion to dismiss for failure to state a claim. Judgment will enter accordingly.


                                        /s/      Timothy M. Reif
                                        Timothy M. Reif, Judge

Dated:    November 13, 2024
          New York, New York

---

[7] In *Chae I,* plaintiff presented an argument concerning the definition of mail packages. *See Chae I*, 46 CIT at __, 579 F. Supp. 3d at 1359 (citing 19 C.F.R. § 145.2(b); 19 C.F.R. § 145.37).  In the instant case, plaintiff attempts to explain the inconsistent definition of "Customs territory."  Compl. at 1; *see also* 19 C.F.R. § 145.2(b); 19 C.F.R. § 101.1.



② Baxter I

KeyCite Red Flag - Severe Negative Treatment

Vacated and Remanded by United States v. Baxter, 3rd Cir.(Virgin Islands), February 21, 2020

2018 WL 6173880

Only the Westlaw citation is currently available.

District Court of the Virgin Islands, Division of St. Thomas and St. John.

UNITED STATES of America, Plaintiff,

v.

Steven BAXTER, Shalica Baxter, Defendants.

Criminal No. 2017-24

|

Filed 11/26/2018

**Attorneys and Law Firms**

Gretchen Shappert, United States Attorney, Everard E. Potter, AUSA, United States Attorney's Office, St. Thomas, U.S.V.I., For the United States of America.

Michael L. Sheesley, St. Thomas, U.S.V.I., For Steven Baxter.

**ORDER**

Curtis V. Gómez, District Judge

**\*1** Before the Court is the motion of Steven Baxter to suppress physical evidence.

**I. FACTUAL AND PROCEDURAL HISTORY**

On March 31, 2017, Customs and Border Protection ("CBP") officers were inspecting incoming mail at the Cyril E. King Airport on St. Thomas. Bo--a K9 certified to alert to the odor of marijuana, cocaine, heroin, methamphetamine, ecstasy, and concealed humans--was smelling packages on an arriving flight at the airport. Bo's handler, Joseph Lopez ("Lopez"), was present. Bo alerted to a package sent by Priority Mail.[1] The package was sent from Jason Price in South Carolina to Mekelya Meade in St. Thomas. CBP officer Richard Kouns ("Kouns")--without consent of the sender or recipient, or the benefit of a court order-- opened the package and discovered a sweater that smelled of marijuana. As Kouns was about to put the sweater back into the package, a magazine and a round of ammunition fell out of the sweater. Kouns then fully opened the sweater and discovered the parts for a weapon. *See Suppression Hr'g Tr.*, ECF No. 99 at 25 (June 4, 2018). Lopez later explained that CBP officials regularly open packages sent from the mainland United States to the United States Virgin Islands without warrants because the CBP has "border search authority" under those circumstances. *See id.* at 35:9.[2]

After hearing evidence, the Court asked the United States why no warrant was sought to search the packages:

THE COURT: ... So, why didn't the Government just get a warrant with respect to the item? It's in the Government's possession. They don't have to release it.... Why not get a warrant to just search it and avoid all of this?

MS. VLASOVA: Your Honor, as law enforcement strategy and tactic, there is no warrant requirement.

**\*2** *Id.* at 116:4-14.

On April 3, 2017, CBP officers discovered another package sent by Priority Mail from Jason Price in South Carolina to Mekelya Meade in St. Thomas. The April 3, 2017, package was similar in shape, size, and weight to the March 31, 2017, package. CBP officers x-rayed the package and concluded that it contained a firearm. Thereafter, the package was opened and examined. Inside the package, Kouns discovered a firearm, a magazine, and ammunition. Curiously, *after* opening the box, Kouns then had Bo sniff the package. *See id.* at 89:12-90:7.

On June 7, 2017, the Grand Jury returned an Indictment charging Steven Baxter ("Baxter") with one count of illegally transporting two firearms in violation of 18 U.S.C. §§ 922(a)(5), 924(a)(1)(D), and 924(a)(2). On March 8, 2018, the Grand Jury returned a Superseding Indictment charging Baxter with two counts of illegally transporting a firearm in violation of 18 U.S.C. §§ 922(a)(5), 924(a)(1)(D), and 924(a)(2).

On March 26, 2018, Baxter moved to suppress the evidence uncovered by the search of the packages. The Court held an evidentiary hearing on Baxter's motion to suppress on June 4, 2018.

## II. DISCUSSION

The Fourth Amendment protects citizens from "unreasonable searches and seizures" of "their persons, houses, papers and effects." U.S. Const., amend. IV. The Fourth Amendment protects citizens from governmental intrusions into areas in which citizens have a "reasonable expectation of privacy." *See, e.g., Byrd v. United States*, 138 S. Ct. 1518, 1526, 200 L.Ed. 2d 805 (2018). "A 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984).

### A. Fourth Amendment Standing

The United States asserts that the packages in this matter were "sent from a Jason Price and addressed to Mekelya Meade." *See* ECF No. 155 at 2. The United States argues that--because the packages do not "bear[ ] his name" and because, "by his not guilty plea, [Baxter] denies an ownership interest" in the packages--Baxter has no legitimate expectation of privacy in the packages. *See id.*

"Standing to challenge a search requires that the individual challenging the search have a reasonable expectation of privacy in the property searched." *Rakas v. Illinois*, 439 U.S. 128 (1978). "Fourth Amendment rights are personal rights, which, like some other constitutional rights, may not be vicariously asserted." *Id. at* 133-34 (quoting *Alderman v. United States*, 394 U.S. 165, 174 (1969) ). "A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed." *Id.* at 134; *see also United States v. Davis* 393 Fed. App'x 895, 898 (3d Cir. 2010).

"Both senders and addressees of packages or other closed containers can reasonably expect that the government will not open them." *United States v. Villarreal*, 963 F.2d 770, 774 (5th Cir. 1992). The Third Circuit has recognized that "individuals may assert a reasonable expectation of privacy in packages addressed to them under fictitious names." *United States v. Pettiway*, 429 Fed. App'x 132, 136 n.5 (3d Cir. 2011) (quoting *Villarreal*, 963 F.2d at 774).

**\*3** Here, the United States acknowledges that Baxter is also known as Jason Price. *See Indictment*, ECF No. 70 at 1, 3, 5 (charging "STEVEN BAXTER a/k/a JASON PRICE" with illegally mailing firearms). The United States alleges that Baxter, using his alias Jason Price, mailed the packages at issue in this matter. Presumably, the packages are relevant because they are Baxter's. That is precisely why the United States seeks to use the packages against Baxter in the United States's case-in-chief. Under these circumstances, the Court holds that Baxter has standing to challenge the admissibility of the packages. As Baxter

has standing to challenge the warrantless searches of the packages, the Court will next address the validity of the warrantless searches that occurred here.

### B. Warrantless Searches of Mail

"Warrantless searches are presumptively unreasonable." *Horton v. California*, 496 U.S. 128, 133 (1990); *see also Katz v. United States*, 389 U.S. 347, 357 (1967) ("Searches conducted without warrants have been held unlawful 'notwithstanding facts unquestionably showing probable cause.' ") (quoting *Agnello v. United States*, 269 U.S. 20, 33 (1925) ). Moreover, it is irrelevant whether a search impermissibly conducted without a warrant ultimately uncovers evidence of a crime. *See Jacobsen*, 466 U.S. at 113 ("Such a warrantless search could not be characterized as reasonable simply because, after the official invasion of privacy occurred, contraband is discovered.").

Article I, Section 8 of the U.S. Constitution grants Congress the power "[t]o establish Post Offices and post Roads." U.S. Const., Art. I, § 8, cl. 7. This grant of power "embraces the regulation of the entire postal system of the country," which "necessarily involves the right to determine what shall be excluded" from the mails. *Ex parte Jackson*, 96 U.S. 727, 728 (1877).

Since as early as 1877, in *Ex parte Jackson*, 96 U.S. 727 (1877), the United States Supreme Court has recognized that this power does not remove mail from the protection of the Fourth Amendment. *See id.* In determining the reach of the Fourth Amendment to mailed matter,

a distinction is to be made between different kinds of mail matter,–between what is intended to be kept free from inspection, such as letters, and sealed packages subject to letter postage; and what is open to inspection, such as newspapers, magazines, pamphlets, and other printed matter, purposely left in a condition to be examined. Letters and sealed packages of this kind in the mail are as fully guarded from examination and inspection, except as to their outward form and weight, as if they were retained by the parties forwarding them in their own domiciles. The constitutional guaranty of the right of the people to be secure in their papers against unreasonable searches and seizures extends to their papers, thus closed against inspection, wherever they may be.
*Id.* at 733.

In light of that strong protection afforded to sealed mail packages against searches, the Supreme Court made it clear that such packages were accorded the same Constitutional protection as items in a home. That is, only a warrant could justify the search of a mail package.

*Whilst in the mail, they can only be opened and examined under like warrant*, issued upon similar oath or affirmation, particularly describing the thing to be seized, *as is required when papers are subjected to search in one's own household.* *Id.* (emphasis added).

Moreover, the *Jackson* Court clearly outlined the limits of any other law that might purport to subjugate the Constitutional protection afforded sealed packages against searches.

*No law of Congress can place in the hands of officials connected with the postal service any authority to invade the secrecy of letters and such sealed packages in the mail; and all regulations adopted as to mail matter of this kind must be in subordination to the great principle embodied in the fourth amendment of the Constitution.*
*4 Id.* (emphasis added).

The Supreme Court reaffirmed these principles in *United States v. Van Leeuwen*, 397 U.S. 249 (1970) and again in *United States v. Jacobsen*, 466 U.S. 109 (1984). In *Van Leeuwen*, customs officials suspected that two packages contained gold coins that had been illegally imported from Canada. 397 U.S. at 249-50. The packages in question were mailed first-class. *Id.* at 250. Postal regulations in effect at the time "describe[d] 'first-class' mail as 'matter closed against postal inspection,' which follow[ed] the definition" in the relevant statute. *Id.* at 250 n.1. The packages were briefly detained while customs officials obtained a warrant

to search them. *Id.* at 250, 252. Only when warrants were issued did customs officials inspect the contents of the packages. *Id.* at 250. On appeal, the Supreme Court held that the pre-search detention of the packages was permissible under the Fourth Amendment. *Id.* at 253.

The Supreme Court explained that "[i]t has long been held that first-class mail such as letters and sealed packages subject to letter postage—as distinguished from newspapers, magazines, pamphlets, and other printed matter—is free from inspection by postal authorities, except in the manner provided by the Fourth Amendment." *Id.* at 251. Analogizing the seizure of mail to a *Terry* frisk, the Supreme Court explained that "[t]he only thing done [by the customs officials] on the basis of suspicion was detention of the packages." *Id.* at 252. This did not occasion any "invasion of the right 'to be secure' in the 'persons, houses, papers, and effects' protected by the Fourth Amendment against 'unreasonable searches and seizures.' " *Id.* (quoting U.S. Const., amend. IV). While in "theory" "detention of mail could at some point become ... unreasonable," the detention in *Van Leeuwen* was reasonable under the Fourth Amendment. *Id.* Significantly, law enforcement did not search the sealed package until they obtained a search warrant.

In *Jacobsen*, a package was damaged and torn by a forklift. The package was in the care of a private freight carrier. 466 U.S. at 111. Employees of the freight carrier opened the package and discovered a white powdery substance. *Id.* The employees notified federal law enforcement officials, who tested the substance, which was revealed to be cocaine. *Id.* On appeal, the Supreme Court held that the search did not violate the Fourth Amendment. *Id.* at 126.

The Fourth Amendment protects individuals' right "to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures." *See* U.S. Const., amend. IV.

> When the wrapped parcel involved in this case was delivered to the private freight carrier, it was unquestionably an "effect" within the meaning of the Fourth Amendment. Letters and other sealed packages are in the general class of effects in which the public at large has a legitimate expectation of privacy; warrantless searches of such effects are presumptively unreasonable. Even when government agents may lawfully seize such a package to prevent loss or destruction of suspected contraband, the Fourth Amendment requires that they obtain a warrant before examining the contents of such a package. Such a warrantless search could not be characterized as reasonable simply because, after the official invasion of privacy occurred, contraband is discovered.

**\*5** *Jacobsen*, 466 U.S. at 114 (footnotes omitted).

Significantly, however, the Fourth Amendment only "proscrib[es] government action; it is wholly inapplicable 'to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any governmental official.' " *Id.* at 114 (quoting *Walter v. United States*, 447 U.S. 649, 662 (1980) (Blackmun, J., dissenting) ). In *Jacobsen*, "[t]he initial invasions of respondents' package were occasioned by private action," and therefore did not violate the Fourth Amendment. *Id.* at 115. The permissibility of the government's subsequent actions "must be tested by the degree to which [those actions] exceeded the scope of the private search." *Id.* In that case, the Supreme Court held that the government's actions did not violate any expectation of privacy that had not already been frustrated by the private freight carrier, and thus did not violate the fourth amendment. *Id.* at 126.

As the cases cited above illustrate, not all packages require a warrant prior to being searched. As the Supreme Court in *Ex parte Jackson* instructed, "a distinction is to be made between different kinds of mail matter,-between what is intended to be kept free from inspection, such as ... sealed packages, ...; and what is open to inspection, such as ... printed matter, purposely left in a condition to be examined." *Ex parte Jackson*, 96 U.S. at 733.

To that end, Congress directed the Postal Service to "maintain one or more classes of mail for the transmission of letters sealed against inspection." 39 U.S.C. § 404(c) ("Section 404"). Congress has further made clear that any mail designated as "sealed against inspection" may only be opened "under authority of a search warrant authorized by law, or by an officer or employee of the Postal Service for the sole purpose of determining an address at which the letter can be delivered, or pursuant to the authorization of the addressee." *Id.*

United States v. Baxter, Not Reported in Fed. Supp. (2018)

In accordance with Congress's mandate, the Postal Service regulations provide that "[s]ealed mail is mail that under postal laws and regulations is included within a class of mail maintained by the Postal Service for the transmission of letters sealed against inspection." 39 C.F.R. § 233.3(c)(3). "Unsealed mail is mail that under postal laws or regulations is not included within a class of mail maintained by the Postal Service for the transmission of letters sealed against inspection." 39 C.F.R. § 233.3(c)(4). "Sealed mail includes," among other classes of mail, "Priority Mail." 39 C.F.R. § 233.3(c)(3).

Similarly, through 39 C.F.R. § 111.1, the Postal Service incorporated into the regulations by reference "the Mailing Standards of the United States Postal Service, Domestic Mail Manual, a looseleaf document published and maintained by the Postal Service." 39 C.F.R. § 111.1. The Domestic Mail Manual provides that "Priority Mail matter is closed against postal inspection." Domestic Mail Manual § 113.2.2.

Here, the packages were mailed from South Carolina to the United States Virgin Islands via Priority Mail. Upon the arrival of the packages in the Virgin Islands, CBP officers searched the packages without a warrant. The government seems to have taken this course because, among other things, the packages did not bear some indication that they were first-class mail or a letter.

*6 Q. ... [A]re you able to determine if this was mailed as a first class mail?

A. It was mailed as a priority mail.

Q. What does that mean in terms of whether or not it is a first class mail?

A. First class mail must always have a stamp on it that states "first class mail" unless there is some separate identify [sic] that clearly defines it as first class.
*Suppression Hr'g Tr.*, ECF No. 99 at 43:8-17. In the absence of a stamp or some indication that the class of mail is first-class, the government, since perhaps 2012, has subjected sealed packages to warrantless searches.

THE COURT: Officer Lopez, when you say "checking the mail," you mean having -- what do you mean by that?

THE WITNESS: Checking the cargo, the boxes, the cargo, because we're not allowed to go to the letter. We cannot touch the letter mail. So we check all of the cargo coming into the Virgin Islands.

Q. (By Mr. Sanchez:) Why can't you get to the letter, to the mail?

A. Those are the rules that we were explained, we cannot touch the letter. Unless we get a search warrant, we can't touch that. *Id.* at 33:13-25.

The government's position not only seems to be contrary to well-established Constitutional law, *see, e.g., Jacobsen*, 466 U.S. at 114 (recognizing "wrapped parcel" containing white powdery substance as "unquestionably an 'effect' within the meaning of the Fourth Amendment"), remarkably it is even contrary to the regulations regarding sealed mail packages. See Domestic Mail Manual § 113.2.2 (" 'Priority Mail matter is closed against postal inspection.' "). Because Priority Mail is the equivalent of a "wrapped parcel" sealed against inspection, law enforcement officers were required to obtain a warrant before opening the packages. Accordingly, their failure to obtain a warrant was unconstitutional. Indeed, such a warrantless search could only be constitutionally permissible if an exception to the warrant requirement applied to the searches undertaken here.

**C. Exception to Warrant Requirement**
"Searches conducted outside the judicial process, without prior approval by a judge or magistrate, are *per se* unreasonable under the Fourth Amendment subject only to a few specifically established exceptions." *Katz*, 389 U.S. at 357. "Such exceptions are based on the Supreme Court's determination that a particular search is reasonable, that is, that the government's legitimate interests in the search outweigh the individual's legitimate expectation of privacy in the object of the search." *United States v. Salmon*, 944 F.2d 1106, 1120 (3d Cir. 1991); *see also United States v. Hyde*, 37 F.3d 116, 118 (3d Cir. 1994). Warrantless

border searches are one such exception. *California Bankers Ass'n v. Shultz*, 416 U.S. 21, 63 (1974) ("[T]hose entering and leaving the country may be examined as to their belongings and effects, all without violating the Fourth Amendment."); *see also Hyde*, 37 F.3d at 118.

In *United States v. Ramsey*, 431 U.S. 606 (1977), the United States Supreme Court recognized that sealed envelopes *originating* in another country and *entering* the United States fell within the border exception. Indeed, in that case, the Supreme Court counseled that

> **\*7**  customs officials could search, without probable cause and without a warrant, envelopes carried by an entering traveler, whether in his luggage or on his person.... Surely no different constitutional standard should apply simply because the envelopes were mailed, not carried. The critical fact is that the envelopes cross the border and enter this country, not that they are brought in by one mode of transportation rather than another. It is their entry into this country from without it that makes a resulting search "reasonable."

*Id.* at 620; *cf. United States v. Hyde*, 37 F.3d 116 (3d Cir. 1994).[3]

To the extent the sealed packages crossed an international border; that is, in either direction between non-United States territory and United States territory, arguably the packages may not be an "effect" protected by the Fourth Amendment. The Court will next address border issues implicated by the searches here, as well as other circumstances that may allow for warrantless searches.

### D. Presence of Circumstances That May Permit Warrantless Searches

Here, CBP officers subjected packages mailed from South Carolina to the Virgin Islands to warrantless searches. South Carolina assuredly is not a foreign country, such that sealed mail from that state would ordinarily be subject to warrantless search. Thus, the Priority Mail packages in this case that originated in South Carolina are sealed domestic mail. *See* Domestic Mail Manual § 113.2.2. Second, they remain protected from a warrantless search unless their native inviolate character is transformed by some intrusive search by a non-government agent, *e.g., Jacobsen* 466 U.S. at 115, or they are transferred to a foreign territory, *see Ramsey*, 431 U.S. at 620. If neither of these circumstances occurred, the Priority Mail packages here should be free from warrantless searches. If neither circumstance occurred and a search is permissible, arguably the Fourth Amendment does not apply in the United States Virgin Islands. Alternatively, it is arguable that some hybrid form of the Fourth Amendment exists in the Virgin Islands, the legal vestiges of which are a version that (1) is devoid of the normal Fourth Amendment Constitutional protections highlighted by the Supreme Court in *Ex parte Jackson*; and (2) lacks any reliable and predictable vigor. The Court addresses each potential transformative circumstance in turn.

### 1. Warrantless Searches by a Private Actor

**\*8**  The record indicates that the searches here were undertaken solely by government officials. Thus, the searches do not fall into the category of searches conducted by private actors (independent of government direction), like that in *Jacobsen*, that escape Fourth Amendment scrutiny.

### 2. Transfer of Package To or From a Non-United States Territory

The packages at issue here were mailed from the mainland to the Virgin Islands. They never left United States territory. Unless some other legally transformative event occurred, a warrantless search of the Priority Mail packages here would be unconstitutional. Indeed, if the sealed packages here were destined for Puerto Rico, there is little dispute that the packages would be protected from warrantless searches. *United States v. Colon-Solis*, 508 F. Supp. 2d 186, 191 n.2 (D.P.R. 2007) (discussing "well-established principle that shipments to and from Puerto Rico are not subject to inspection under the border exception to the

Case 1:24-cv-00086-TMR    Document 19    Filed 01/22/25    Page 19 of 63

United States v. Baxter, Not Reported in Fed. Supp. (2018)

Fourth Amendment"). The United States has indicated as much in its supplemental briefing on Baxter's motion to suppress. *See* ECF No. 155 at 1 ("The Court's initial inquiry posed two questions. The first question is whether Customs and Border protection can search mail arriving in Puerto Rico from the mainland United States without first obtaining a warrant. The government's answer is no."); *see also Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*, 337 F.3d 314, 319 (3d Cir. 2003) ("[A] plaintiff, who has obtained relief from an adversary by asserting and offering proof to support one position, may not be heard later in the same court to contradict himself in an effort to establish against the same adversary a second claim inconsistent with his earlier contention." (internal quotation marks omitted) ). That position is not surprising, as Puerto Rico is a territory of the United States. A person or thing traveling from the mainland United States to Puerto Rico leaves United States territory and arrives in United States territory. Given that circumstance, it would seem that, constitutionally, a warrantless search of the packages here may be permissible if, unlike a package arriving in Puerto Rico, arrival in the Virgin Islands was the legal equivalent of arrival in a non-United States territory.

This Court recently addressed the domestic nature of the United States Virgin Islands in the context of a tariff law. In *United States v. Ten Thousand Six Hundred & Seventy-Seven Dollars ($10,677.00) in U.S. Currency, Representing 5,419 Puerto Rican Lottery Tickets*, No. CV 2016-12, 2018 WL 2745903, at *4 (D.V.I. June 7, 2018) (the "Puerto Rican Lottery Case"), this Court was confronted with the question of whether the United States Virgin Islands was a "foreign country" under 19 U.S.C. § 1305(a) ("Section 1305"), which provides that "[a]ll persons are prohibited from importing into the United States from any foreign country ... any lottery ticket." *See* 19 U.S.C. § 1305(a).

In the Puerto Rican Lottery case, the Court reasoned:

> Section 1305(a) forbids an individual from "importing [certain goods] into the United States *from any foreign country*." 19 U.S.C. § 1305(a) (emphasis added). The text references two geographic categories: the United States and foreign countries. It does not necessarily follow that there are *only* two dichotomous geographic categories for customs purposes: the United States customs territory (which excludes the Virgin Islands) and foreign countries (of which the Virgin Islands would be regarded as part). If that were the case, then the phrase "from any foreign country," would be entirely superfluous as any good "import[ed] ... *into* the United States" would necessarily be imported from a foreign country. *See id.* (emphasis added).

**\*9** *Id.* at *4. In addition to the plain language of the statute, the Court also found that "[r]elevant caselaw pre-dating the passage of 19 U.S.C. § 1305(a) also supports the conclusion that the Virgin Islands is not a foreign country." *Id.* at *6. The Court explained:

> The Supreme Court first addressed whether a United States territory constituted a foreign country under the tariff laws in *De Lima v. Bidwell*. 182 U.S. 1, 21 S. Ct. 743, 45 L.Ed. 1041 (1901). In that case, the Supreme Court considered whether a tariff statute that provided that certain duties "shall be levied, collected, and paid upon all articles imported from foreign countries" applied to articles imported from Puerto Rico. *Id.* at 180-181. The Supreme Court held that the statute did not apply. It reasoned, in pertinent part, that:

> > Territory thus acquired can remain a foreign country under the tariff laws only upon one or two theories: Either that the word 'foreign' applies to such countries as were foreign at the time the statute was enacted, notwithstanding any subsequent change in their condition, or that they remain foreign under the tariff laws until Congress has formally embraced them within the customs union of the states. The first theory is obviously untenable ... *[A] country ceases to be foreign the instant it becomes domestic.* So, too, if Congress saw fit to cede one of its newly acquired territories (even assuming that it had the right to do so) to a foreign power, there could be no doubt that from the day of such cession and the delivery of possession such territory would become a foreign country, and be reinstated as such under the tariff law. Certainly no act of Congress would be necessary in such case to declare that the laws of the United States had ceased to apply to it.

> > *The theory that a country remains foreign with respect to the tariff laws until Congress has acted by embracing it within the customs union presupposes that a country may be domestic for one purpose and foreign for another.* It may undoubtedly become necessary, for the adequate administration of a domestic territory, to pass a special act providing the proper machinery and officers, as the President would have no authority, except under the war power, to administer it himself;

but no act is necessary to make it domestic territory if once it has been ceded to the United States. We express no opinion as to whether Congress is bound to appropriate the money to pay for it. This has been much discussed by writers upon constitutional law, but it is not necessary to consider it in this case, as Congress made prompt appropriation of the money stipulated in the treaty. *This theory also presupposes that territory may be held indefinitely by the United States*; that it may be treated in every particular, except for tariff purposes, as domestic territory; that laws may be enacted and enforced by officers of the United States sent there for that purpose; that insurrections may be suppressed, wars carried on, revenues collected, taxes imposed; in short, that everything may be done which a government can do within its own boundaries, and yet that the territory may still remain a foreign country. That this state of things may continue for years, for a century even, but that until Congress enacts otherwise, it still remains a foreign country. To hold that this can be done as matter of law we deem to be pure judicial legislation. *We find no warrant for it in the Constitution or in the powers conferred upon this court.* It is true the nonaction of Congress may occasion a temporary inconvenience; but it does not follow that courts of justice are authorized to remedy it by inverting the ordinary meaning of words.

**\*10** *Id.* at 197–98 (emphasis added). The Supreme Court subsequently reaffirmed, several times, that a United States territory is not a foreign country. *See, e.g., The Diamond Rings*, 183 U.S. 176, 22 S. Ct. 59, 46 L.Ed. 138 (1901) (reaching the same conclusion with respect to the Philippine Islands); *Faber v. United States*, 221 U.S. 649, 658, 31 S. Ct. 659, 659, 55 L.Ed. 897 (1911)(holding that a most favored nation clause in a treaty with Cuba did not require the United States to extend to Cuba a preferential duty rate that had been granted to the Philippine Islands). *Id.*

While not directly on point, the reasoning in the Puerto Rican Lottery Case provides some guidance here on the question of whether the United States Virgin Islands is non-United States territory for Fourth Amendment purposes, such that it should be treated differently than Puerto Rico with respect to warrantless searches of sealed packages travelling from the United States mainland to a well-established United States territory.[4] The Court is aware of no precedent that would require treating the United States Virgin Islands as a foreign country or non-United States territory for the purposes of the Fourth Amendment.

### 3. Application of the Fourth Amendment in the Virgin Islands

While the Virgin Islands is "[o]bviously ... not a 'foreign country,' " it is not a state. *Vento v. Dir. of Virgin Islands Bureau of Internal Revenue*, 715 F.3d 455, 466 (3d Cir. 2013). Rather, the Virgin Islands is "an unincorporated territory of the United States." *Ballentine v. United States*, 486 F.3d 806, 811 (3d Cir. 2007). The Third Circuit has opined that "[a]n unincorporated territory is one that is not nearing statehood and whose subjects do not enjoy full constitutional guarantees. For example, Virgin Islands residents are not permitted to vote in presidential elections, although they are U.S. citizens. They are represented in Congress by a single non-voting delegate." *Vooys*, 901 F.3d at 177 n.10 (citations omitted). The Fourth Amendment, however, is not among the constitutional guarantees denied to Virgin Islanders. *See* 48 U.S.C. § 1561 (providing that "the first to ninth amendments inclusive" "shall have the same force and effect there as in the United States or in any State of the United States").

Indeed, it is well-settled that "[t]he Fourth Amendment applies in the United States Virgin Islands." *United States v. Mathurin*, 561 F.3d 170, 174 n.3 (3d Cir. 2009); *see also Boumediene v. Bush*, 553 U.S. 723, 758 (2008) (explaining that, "as early as ... 1922, the [U.S. Supreme] Court took for granted that even in unincorporated Territories the Government of the United States was bound to provide to noncitizen inhabitants 'guaranties of certain fundamental personal rights declared in the Constitution.' ") (quoting *Balzac v. Porto Rico*, 258 U.S. 298, 312 (1922) ); *Soto v. United States*, 273 F. 628, 633 (3d Cir. 1921) (explaining that after the United States acquired the United States Virgin Islands, "the fundamental law of the Constitution guaranteeing certain rights to all within its protection," namely the law securing "natural or personal rights" that are "enforced ... by prohibition against interference," applied of its own force).

United States v. Baxter, Not Reported in Fed. Supp. (2018)

**4. Customs Zone Exclusion as a Basis for Hybrid Application of Fourth Amendment to United States Territory**

**\*11**  The Court will next consider whether, in spite of the United States Virgin Islands's status as a United States Territory, there is nevertheless some type of border that would justify warrantless searches on persons and things traveling from the mainland United States to the United States Virgin Islands.

To appreciate the underpinnings that should inform any border or customs zone discussion involving the Virgin Islands, a brief review of some Virgin Islands history is warranted.

On April 1, 1914, Christian the Tenth, King of Denmark, the Vandals and the Goths, Duke of Slesvig, Holstein, Stormarn, Ditmarsh, Lauenborg, and Oldenborg, sanctioned Danish Law No. 64-1914. Section 1 of that law, in pertinent part, provides:

On all goods which are imported in St. Thomas and St. Jan, and which do not, according to § 2 below, enter duty free, an import duty of 6% of the value shall be imposed ....

Act No. 64-1914, concerning Custom House and Ships Dues in St. Thomas and St. Jan, § 1 (Apr. 1, 1914), *reprinted in* 1 V.I.C., Historical Documents, Organic Act of 1936. In accord with Danish Law No. 64-1914, an ordinance of the Colonial Council of St. Thomas and St. Jan, approved on August 6, 1914, provided guidance for the imposition and collection of import duties. Colonial Council of St. Thomas and St. Jan Ordinance of August 6, 1914 (Aug. 6, 1914), *reprinted in* 1 V.I.C., Historical Documents, Organic Act of 1936. Section 29 of the Ordinance provided, in pertinent part, that

[a]ll amounts derived from confiscations and fines, arising from this Ordinance, shall accrue to the Colonial Treasury ....
*Id.* at § 29.

"When the United States purchased the Virgin Islands from Denmark in 1917, laws were already in place which provided for Customs duties to be levied upon goods coming into the Virgin Islands, with the revenue going to the colonial treasury." *Paradise Motors, Inc. v. Murphy*, 892 F. Supp. 703, 704 (D.V.I. 1994) (quoting *United States v. Chabot*, 19 V.I. 28, 37, 531 F. Supp. 1063, 1069 (D.V.I. 1982) ). After purchasing the Virgin Islands, Congress passed the Organic Act of 1917 (the "1917 Organic Act"). Section 4 of that act, codified at 48 U.S.C. § 1395, provides in relevant part that "the customs laws and regulations" in the Virgin Islands in effect before the purchase would "continue in force and effect."[5] Pub. L. No. 64-389, § 4, 39 Stat. 1132 (1917). In 1932, Congress amended the 1917 Organic Act to provide: "The officials of the Customs and Postal Services of the United Sates are hereby directed to assist the appropriate officials of the municipality of Saint Croix, or of the municipality of Saint Thomas and Saint John, in the collection of these taxes." Pub. L. No. 72-193, § 4, 47 Stat. 333 (1932).

**\*12**  In 1936, Congress passed the Organic Act of 1936 (the "1936 Organic Act"). Section 36 of that act, codified at 48 U.S.C. § 1406i, provides in relevant part that, "[u]ntil Congress shall otherwise provide, all laws concerning import duties and customs in the municipality of Saint Thomas and Saint John now in effect shall be in force and effect in and for the Virgin Islands." Pub. L. No. 74-749, § 36, 49 Stat. 1816 (1936). Section 36 also directed the Secretary of the Treasury to "designate the several ports and sub-ports of entry in the Virgin Islands of the United States and shall make such rules and regulations and appoint such officers and employees as he may deem necessary for the administration of the [local] customs laws in the Virgin Islands of the United States." *Id.*

In 1954, Congress passed the Revised Organic Act. The Revised Organic Act did not speak to the Danish custom laws addressed in Section 36 of the 1936 Organic Act and Section 4 of the 1917 Organic Act. Section 8 of the Revised Organic Act, codified at 48 U.S.C. 1574, provided, however, that the "laws made applicable to the Virgin Islands by or pursuant to the [1936 Revised Organic] Act ... and all local laws and ordinances in force in the Virgin Islands ... on the date of approval of this Act shall, to the extent they are not inconsistent with this Act, continue in force and effect." Pub. L. No. 83-517, § 7(c), 68 Stat 501 (1954). As such, Section 36 of the 1936 Organic Act remains in effect. *See, e.g., Polychrome Int'l Corp. v. Krigger*, 5 F.3d 1522, 1534 n.

29 (3d Cir. 1993). Under Section 28 of the Revised Organic Act, the "proceeds of customs duties, ... less the cost of collecting such duties," were to "be covered into the treasury of the Virgin Islands."[6] Pub. L. No. 83-517, § 28(a), 68 Stat 501 (1954).

In 1977, Congress amended Section 8 of the Revised Organic Act and added a subsection (f). *See* Pub. L. No. 95–134 (HR 6550), § 301(c), 91 Stat 1159 (1977). Subsection (f) provides:

> (f) Customs duty; duty-free importation; effect on other customs laws

> (1) The Legislature of the Virgin Islands may impose on the importation of any article into the Virgin Islands for consumption therein a customs duty. The rate of any customs duty imposed on any article under this subsection may not exceed--

>> (A) if an ad valorem rate, 6 per centum ad valorem; or

>> (B) if a specific rate or a combination ad valorem and specific rate, the equivalent or 6 per centum ad valorem.

> (2) Nothing in this subsection shall prohibit the Legislature of the Virgin Islands from permitting the duty-free importation of any article.

> (3) Nothing in this subsection shall be construed as empowering the Legislature of the Virgin Islands to repeal or amend any provision in law in effect on the day before October 15, 1977, which pertains to the customs valuation or customs classification of articles imported into the Virgin Islands.

*Id.; see also* 48 U.S.C. § 1574(f).

Under this authority, the Government of the Virgin Islands enacted 33 V.I.C. § 525 ("Section 525"). Section 525 provides:

> The amount of customs duty to be paid on any article of foreign origin imported into the Virgin Islands which article has been shipped from within the United States Customs Zone shall be that amount which when added to the duty paid to the United States on said article equals six percent of the value of the article when imported into the Virgin Islands. For the purpose of the preceding sentence, the amount of the duty paid in the United States shall be construed to be the greater of the following:

> **\*13** (1) The amount of duty actually paid on said articles to the United States as shown on a receipt from the U.S. Customs Service or by other documentation acceptable to the U.S. Customs Service officials in the Virgin Islands.

> (2) The amount of duty that would be payable on said article to the United States based on the rates of duty on such articles shown in the tariff schedules of the United States, as amended (12 U.S.C. § 1202), and the value of such article when imported into the United States.

> In the case of (2) above, documentation acceptable to the U.S. Customs Service officials in the Virgin Islands showing that the item has been shipped from within the United States Customs Zone shall be required of the importer. Should the amount of duty paid to the United States on an article as computed under (1) or (2) above be six percent or greater of the value of the article when imported into the Virgin Islands, then such article shall enter the Virgin Islands free of duty.

> For the purposes of this section, an article is not shipped from within the United States Customs Zone if it is shipped from a duty-free warehouse located in the United States, if it is transshipped through the United States without incurring a customs duty in the United States, or if it is shipped in any other manner which avoids the payment of a customs duty in the United States.

33 V.I.C. § 525. In addition, while the Virgin Islands repealed all Danish laws when it adopted the Virgin Islands Code, it exempted "the 'Law concerning Custom House and Ship Dues in St. Thomas and St. Jan' " from that repeal. *See* 1 V.I.C. § 6.

As discussed above, Section 36 of the 1936 Organic Act directed the Secretary of the Treasury to "make such rules and regulations and appoint such officers and employees as he may deem necessary for the administration of the customs laws in the

Virgin Islands of the United States." 48 U.S.C. § 1406i. Pursuant to that direction, the Secretary of the Treasury promulgated 19 C.F.R. § 7.2. That regulation, in relevant part, provides:

> The Secretary of the Treasury administers the customs laws of the U.S. Virgin Islands through the U.S. Customs and Border Protection. The importation of goods into the U.S. Virgin Islands is governed by Virgin Islands law; however, in situations where there is no applicable Virgin Islands law or no U.S. law specifically made applicable to the Virgin Islands, U.S. laws and regulations shall be used as a guide and be complied with as nearly as possible. Tariff classification of, and rates of duty applicable to, goods imported into the U.S. Virgin Islands are established by the Virgin Islands legislature.

19 C.F.R. § 7.2(c); *see also Virgin Islands Port Auth. v. United States*, 136 Fed. Cl. 7, 8–9 (2018) ("As a part of the Treasury Department, CBP's authority to administer customs law in the Virgin Islands derives from the 1936 Revised Organic Act which designated the Secretary of Treasury as administrator of Virgin Islands customs law."); *United States v. Wray*, No. CR. 2002-53, 2002 WL 31628435, at *3 (D.V.I. June 17, 2002) ("[T]he executive branch maintains jurisdiction over the administration of customs laws within the Virgin Islands by virtue of the language of section 36 of the 1936 Organic Act.").

**\*14** As authorized by Congress, the Government of the Virgin Islands imposes duties on many items of foreign origin that may be imported into the United States Virgin Islands. *See* 33 V.I.C. § 525 (authorizing collection of customs duty on "any article of foreign origin imported into the Virgin Islands[,] which ... has been shipped from within the United States Customs Zone," in addition to duties collected in the United States). An obligation to pay customs duties arises when certain items cross from the mainland United States into the United States Virgin Islands. Arguably then, some type of border--or an approximation of one--exists between the United States Virgin Islands and the rest of the United States with respect to items of foreign--that is, non-United States--origin leaving the mainland and entering the Virgin Islands. Significantly, however, while the enforcement of Virgin Islands customs laws is assisted by federal officials, the customs laws with respect to imported goods are not federal but territorial laws. See *Pollard*, 326 F.3d at 401; *Hyde*, 37 F.3d at 121. While routine warrantless border searches would aid in enforcing the custom laws of the Virgin Islands, the interest of the United States in the enforcement of territorial law is certainly no greater than the interest of the United States in enforcing its own Constitution.[7] Further, in *Hyde*, the Third Circuit found significant that Congress, through 19 U.S.C. § 1467, had "specifically authorized customs inspections when travelers enter the United States from the Virgin Islands and other United States possessions in the same manner as if the traveler had come from a foreign country." *See Hyde*, 37 F.3d at 121. The Court is aware of no statutory authority authorizing similar inspections of persons or items entering the United States Virgin Islands from the United States mainland.

Moreover, there is no Supreme Court authority that supports the proposition that recognition, or imposition, of a tax, impost, or duty on sealed items traveling from a State into a United States territory creates a border between the United States territory and the State, at which border there is no Fourth Amendment protection that attaches to the individual whose sealed package travels from the State to the United States Territory.

To be sure, there is appellate authority recognizing the exclusion of the Virgin Islands from the United States customs zone. *See Hyde*, 37 F.3d at 122. The Third Circuit has not extended this recognition to items traveling from the mainland to the United States Virgin Islands. Indeed, the government has directed the Court to no such authority; and the Court is aware of none.

**\*15** Further, no authority has acknowledged that the primary purpose of the customs zone exclusion was to create a vehicle for revenue enhancement in the then newly acquired Virgin Islands and its developing economy. Yet, that is precisely what the relevant legislative history indicates. *See Anti-Smuggling Act: Hearings on H.R. 5496 Before the Comm. on Ways and Means*, 74th Cong. 61 (1935) ("MR. HILL. Why are the Virgin Islands excepted [from the tariff act's definition of the 'United States']? MR. MURPHY. The duties in the Virgin Islands are collected under the old Danish law. At the time the Virgin Islands came over to us that law was in effect. The collection of duties, of course, comes under this Government, but the old law remained in effect, and the duties go to the islands themselves."); H. Rep. No. 1505, at 6 (1917) (explaining that provision in 1917 Organic Act leaving Danish customs laws in effect was intended to raise "import duties to support the government of the islands"). Indeed, in 1914, the import duty was conceived as a tool to augment and support the then-Danish "Colonial Treasury." Thereafter, when Congress continued collection of the import duty, through the mechanism of a customs zone exclusion, it was a device to support

the local Virgin Islands economy. It is beyond peradventure that Congress did not conceive of the customs zone exclusion as a device to weaken "fundamental personal rights guaranteed in the Constitution," *Boumediene*, 553 U.S. at 758 (internal quotation marks omitted), such as those enshrined in the Fourth Amendment. The Court is aware of no organic Congressional decision or enactment about the Virgin Islands suggesting that the customs zone exclusion was to be a vehicle for a diminished view of Constitutional protections afforded sealed items sent from the mainland to the Virgin Islands, and the government has cited none.[8]

Finally, the rationale for a border, and the border search exception, is to keep out of the United States, or protect against, those things which are outside of its border. *See United States v. Montoya de Hernandez*, 473 U.S. 531, 537 (1985) ("Since the founding of our Republic, Congress has granted the Executive plenary authority to conduct routine searches and seizures at the border, without probable cause or a warrant, in order to regulate the collection of duties and to prevent the introduction of contraband into this country."). Recognizing that purpose, the Supreme Court has counseled:

> The border-search exception is grounded in the recognized right of the sovereign to control, subject to substantive limitations imposed by the Constitution, who and what may enter the country.... The critical fact is that the envelopes cross the border and enter this country.... It is their entry into this country *from without it* that makes a resulting search "reasonable." *Ramsey*, 431 U.S. at 620 (emphasis added).

It is axiomatic that those things that originate in, and stay within, the territory of the United States remain free from border searches.[9] A central point highlighted by the Supreme Court in its border search jurisprudence is that items subject to a border search enter the country "*from without it.*" *See id.* (emphasis added); *see also Almeida-Sanchez v. United States*, 413 U.S. 266, 272 (1973) (" 'Travellers may be so stopped in crossing an international boundary because of national self protection reasonably requiring one entering the country to identify himself as entitled to come in, and his belongings as effects which may be lawfully brought in.' ") (quoting *Carroll v. United States*, 267 U.S. 132, 154 (1925) ). The sealed packages that arrived in the United States Virgin Islands did not come from "without" the country.

**\*16** Accordingly, the Court will grant Baxter's motion to suppress.

## III. CONCLUSION

The Fourth Amendment of the United States Constitution has protected individuals from unreasonable warrantless searches since its existence. That protection has been recognized by the United States Supreme Court as extending to sealed mail among and between United States residents within United States territory. The circumstances giving rise to this case--warrantless searches of sealed mail packages sent from the United States mainland to the United States Virgin Islands--raise several questions.

First, does the Fourth Amendment apply in the United States Virgin Islands? For almost a century, this Court has addressed challenges to alleged violations of the Fourth Amendment by law enforcement.[10] Significantly, the recognition of the Fourth Amendment's protection in the United States Virgin Islands has been unchallenged.

Second, to the extent that the Fourth Amendment applies in the United States Virgin Islands, does it exist in some hybrid form such that its protections fade, to some degree, merely because a sealed package originating in the United States mainland arrives in the United States Virgin Islands? The position taken by law enforcement here suggests that a Congressional act or administrative procedure that excludes the United States Virgin Islands from the United States Customs Zone does so in a way that denatures the Fourth Amendment such that its full protection, which exists for citizens that send sealed packages from the mainland to Puerto Rico,[11] fails to protect those citizens who send sealed packages from the mainland to the United States Virgin Islands.

**\*17** The Court is not persuaded that the Constitution supports such a position. *See, e.g., Marbury v. Madison*, 5 U.S. 137, 180 (1803) ("[A] law repugnant to the constitution is void; ... courts, as well as other departments, are bound by that instrument." (emphasis omitted) ). Indeed, the Fourth Amendment is pregnant with protection against warrantless searches of citizens and their effects, including sealed packages, houses, papers and effects.[12] Neither the existence nor vigor of those protections is compromised because the destination of a sealed package from the United States mainland happens to be the United States Virgin Islands.

To the extent that the government engages in warrantless searches because it is tactical to do so, as it has indicated in this case and a related case, *see Suppression Hr'g Tr.*, ECF No. 99 at 116:4-14 ("THE COURT: ... Why not get a warrant to just search [packages] and avoid all of this? MS. VLASOVA: Your Honor, as law enforcement strategy and tactic...."); *Suppression Hr'g Tr.*, Crim. No. 1:17-11, ECF No. 85 at 4:23-5:1 ("Q: Was there a specific target that was causing you to perform this search? A: No, ma'am. Just doing everything at random."), it elevates expediency over the Constitution in a way it admittedly would never do in a state or Puerto Rico, and it does so unlawfully. Where that happens it is worth recalling the Supreme Court's admonition:

> The needs of law enforcement stand in constant tension with the Constitution's protections of the individual against certain exercises of official power. It is precisely the predictability of these pressures that counsels a resolute loyalty to constitutional safeguards.

*Almeida-Sanchez*, 413 U.S. at 273. Finally, the *sine qua non* for a border search is that the item enter the country from without. That threshold condition never occurred. In sum, where, as here, law enforcement conducts warrantless searches of sealed packages sent from the United States mainland to the United States Virgin Islands, law enforcement runs afoul of the Constitution.[13]

The premises considered, it is hereby

**ORDERED** that the Court's order at the June 4, 2018, suppression hearing denying in part the motion to suppress docketed at ECF Number 79 is **VACATED**; it is further

**ORDERED** that the motion to suppress docketed at ECF Number 79 is **GRANTED**; and it is further

**ORDERED** that the physical evidence recovered from the warrantless searches conducted on March 31, 2017, and April 3, 2017, is **SUPPRESSED**.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 6173880

Footnotes

1    Priority mail is one of several "classes of mail" that is maintained by the postal service "for the transmission of letters sealed against inspection." 39 U.S.C. § 404(c); *see also* Domestic Mail Manual § 113.2.2 ("Priority Mail matter is closed against postal inspection.").

2    Lopez also shared his view that Bo is never wrong. Rather, human interpretation of what Bo indicates has been wrong.

Q. Has Bo ever been wrong in the alert that he had provided?

A. I don't think Bo is wrong. I think I may do a wrong interpretation.

Q. What does that mean?

United States v. Baxter, Not Reported in Fed. Supp. (2018)

A. With the alert that means that I can see that he changed his behavior, like something calls his attention that I can believe is an alert, and I do a wrong call, maybe, but I don't see that Bo has been wrong. He has been really reliable for the agency finding narcotics.

*Suppression Hr'g Tr.*, ECF No. 99 at 21:2-12. Alternatively, it seems that whenever Bo incorrectly alerts, Lopez is willing to take the blame by attributing the error to human interpretation.

Q. And you've said before that Bo has not been wrong but you have been wrong before.

A. Yes, Sir.

Q. Okay. And so some alerts that Bo has given has led to nothing.

A. Some alerts that I believe that Bo given [sic] alert to went to nothing.

*Id.* at 31:5-11. In either case, false positives which could trigger warrantless searches could result.

3    In *United States v. Hyde*, 37 F.3d 116 (3d Cir. 1994), the defendants were subjected to warrantless searches in the St. Thomas airport as they were leaving the Virgin Islands for Florida. *Id.* at 117. The Third Circuit held "that routine customs search of persons and their belongings without probable cause as they leave the Virgin Islands for the continental United States are not unreasonable under the Fourth Amendment." *Id.* at 117.

As for the individual's interest in privacy, the Third Circuit found this was limited in the same manner as with the international border. *Id.* "[B]order searches have been consistently conducted at the border between the Virgin Islands and the mainland since the United States acquired the Virgin Islands." *Id.* While there might not be universal knowledge of this fact, the Third Circuit "believe[d] that there [wa]s sufficient public knowledge of the distinctive status of the Virgin Islands to alert such travelers to the possibility of border inquiries not experienced at state lines." *Id.*

"Balancing the intrusion on the individual's Fourth Amendment interests against the degree to which routine customs searches promote legitimate governmental interests," the Third Circuit held that the searches in that case were not unreasonable under the Fourth Amendment. *Id.*

4    The Virgin Islands, like Puerto Rico, has been part of the United States for more than a century. They each have local government, with local courts, legislatures, and executives. See, e.g., *Rodriquez v. 32nd Legislature of Virgin Islands*, 859 F.3d 199, 206 (3d Cir. 2017) (explaining that "the [Revised Organic Act of 1954] divides the Virgin Islands government into legislative, executive, and judicial branches and thereby 'implicitly incorporate[s] the principle of separation of powers into the law of the territory' ") (quoting *Kendall v. Russell*, 572 F.3d 126, 135 (3d Cir. 2009) ); *Buscaglia v. Dist. Court of San Juan*, 145 F.2d 274, 283 (1st Cir. 1944) ("We concede that the doctrine of separation of powers is implicit in the Organic Act of Puerto Rico[, which divides the government of Puerto Rico into legislative, executive, and judicial branches].").

5    The Danish customs laws extended by the Act of 1917 referred primarily to the import duty established and enforced pursuant to two Danish laws, both enacted in 1914. The first law imposed a 6% "import duty" on all goods imported into St. Thomas and St. John. Danish Law No. 64 of April 1, 1914, concerning Custom House and Ships Dues in St. Thomas and St. Jan ("Danish Law No. 64"), *reprinted in* V.I. Code Ann., Historical Documents, 69–74 (1967). The second law, Ordinance of August 6, 1914, promulgated rules for the collection of the import duty established by Danish Law No. 64. Ordinance of August 6, 1914, *reprinted in* V.I. Code Ann., Historical Documents, 74–81 (1967) ("Ordinance of 1914").

As originally enacted, these laws did not apply to the island of St. Croix; however in 1936 Congress made these Danish customs laws applicable throughout the Virgin Islands. 48 U.S.C. § 1406i (1976).

*Paradise Motors, Inc.*, 892 F. Supp. at 705.

6    In 1980, Congress passed 48 U.S.C. § 1642a, which similarly provides that "the proceeds of customs duties collected in the Virgin Islands less the cost of collecting all said duties shall ... be covered into the Treasury of the Virgin Islands." 48 U.S.C. § 1642a; see also Pub. L. No. 96-304, Title I, § 100, 94 Stat. 907 (1980).

7    With respect to the individual's interest, it is unclear how long the United States has been conducting routine warrantless searches of incoming mail. U.S. customs regulations provide that "all mail arriving from outside the U.S. Virgin Islands which is to be delivered within the U.S. Virgin Islands, is subject to Customs examination." 19 C.F.R. § 145.2. This broad asserted authority seems at odds with another regulation, which clarifies that "[f]irst class mail originating in the Customs territory of the United States and arriving in the U.S. Virgin Islands, which is to be delivered within the U.S. Virgin Islands, shall not be opened unless: (1) A search warrant authorizing that action has been obtained from an appropriate judge or United States magistrate, or (2) The sender or the addressee has been given written authorization for the opening." 19 C.F.R. § 145.3; *see also* 19 C.F.R. § Pt. 145, Policy ("Customs officers and employees shall not open first class mail arriving in the U.S. Virgin Islands for delivery there, if it originated in the Customs territory of the United States, unless a search warrant or written authorization of the sender or addressee is obtained.").

    Further, to the extent these searches have been consistently conducted, there is less cause to find "sufficient public knowledge of the distinctive status of the Virgin Islands to alert" those sending mail to the Virgin Islands that their packages may be searched without a warrant. *See id.* Individuals departing the Virgin Islands for the United States pass through a customs checkpoint. This is an obvious signal to travelers that leaving the Virgin Islands and entering a state is somewhat different than traveling from one state to another. Individuals entering the Virgin Islands from a state pass through no such obstacles that would alert them of the fact that leaving a state and entering the Virgin Islands is materially different than traveling between the states.

    In sum, the Court finds that the government's interest in conducting the type of search at issue here is less compelling than the government's interest in conducting the searches at issue in *Hyde.* In addition, the intrusion on privacy here is more significant than the intrusion presented in *Hyde.* Balancing these interests, the Court holds that the warrantless searches of the sealed mail packages in this matter were not reasonable.

8    Any argument that the Virgin Islands's status as a territory warrants a different conclusion is similarly unavailing. Indeed, the Third Circuit, in another context, has recognized the vigor of a Constitutional mandate implicit in legislation affecting the territory. *See JDS Realty Corp. v. Gov't of Virgin Islands*, 824 F.2d 256, 259 (3d Cir. 1987), *judgment vacated on other grounds*, 484 U.S. 999 (1988) ("That the Virgin Islands is an unincorporated territory is of no consequence in terms of the constitution's grant of affirmative power to Congress to regulate interstate commerce.... We conclude that the powers granted to Congress by the commerce clause are implicit in the territorial clause.").

9    Thus, in the context of border searches, the following syllogism should hold true.

        (a) Sealed packages originating in a State mailed to a United States destination are packages that travel and remain within the United States.

        (b) Packages that travel and remain within the United States enjoy the protection of the Fourth Amendment from warrantless searches.

        (c) Therefore, sealed packages originating in a State that are mailed to a United States destination enjoy the protection of the Fourth Amendment from warrantless searches.

    The argument advanced by the government here challenges that logic. Indeed, the government's position causes the syllogism to implode.

10    *See, e.g., United States v. Wright*, 493 Fed. App'x 265, 271 (3d Cir. 2012) ("Having settled that the warrants were deficient, we turn to the issue of whether their deficiencies, when coupled with the law enforcement conduct here, require suppression of the evidence found during the search."); *United States v. Varlack Ventures*, 149 F.3d 212, 216 (3d Cir. 1998) ("[W]e have no need to decide whether Fredericks enjoyed a reasonable expectation of privacy in the public areas of his vessel since, even if he did, the Coast Guard officers fulfilled the requirements for conducting a warrantless search of his vessel."); *United States v. Williams*, 612 F.2d 735, 739 (3d Cir. 1979) ("Exigent circumstances therefore existed, and we see no reason to second-guess their tactical decision to deny the suspect the advantages that delay to procure a warrant would have presented."); *Gov't of V.I. v. Rijos*, 285 F. Supp. 126, 132 (D.V.I. 1968) ("Since the issuance of the search warrant in this case was based upon sufficient probable cause, the subsequent search will not be deemed invalid on this basis."); *People v. Fisher*, 2 V.I. 395, 399 (Police Ct. 1953) ("That no warrant shall issue but upon probable cause supported by oath or affirmation and particularly describing as the place to be searched and the persons or things to be seized.").

United States v. Baxter, Not Reported in Fed. Supp. (2018)

11    Puerto Rico is within the United States Customs Zone. See 19 U.S.C. § 1401(h) ("The term 'United States' includes all Territories and possessions of the United States except the Virgin Islands, American Samoa, Wake Island, Midway Islands, Kingman Reef, Johnston Island, and the island of Guam.").

12    The Supreme Court has recognized as much, instructing: "Letters and other sealed packages are in the general class of effects in which the public at large has a legitimate expectation of privacy." *Jacobsen*, 466 U.S. at 114. The packages here are no different.

13    In light of clear Supreme Court authority, it would seem to behoove law enforcement to obtain a search warrant before searching any sealed mail letter, package, or "wrapped parcel" travelling in any direction between the Virgin Islands and the mainland. Given that such "effects" are in the custody and control of law enforcement, and there is no danger of loss or destruction of the effect, it would seem constitutionally prudent, and a minor task, to obtain a search warrant.

---

**End of Document**                                  © 2025 Thomson Reuters. No claim to original U.S. Government Works.



③ Baxter II

951 F.3d 128
United States Court of Appeals, Third Circuit.

UNITED STATES of America, Appellant

v.

Steven BAXTER

No. 18-3613
|
Argued December 11, 2019
|
(Filed: February 21, 2020)

**Synopsis**
**Background:** Defendant, who was charged with illegal transport of firearm, moved to suppress. The United States District Court for the District of the U.S. Virgin Islands, Curtis V. Gomez, J., 2018 WL 6173880, granted motion. United States appealed.

**[Holding:]** The Court of Appeals, Smith, Chief Judge, held that United States Customs and Border Protection (CBP) agents' warrantless searches of packages defendant allegedly mailed to United States Virgin Islands were permissible under border-search exception to Fourth Amendment.

Vacated and remanded.

West Headnotes (9)

**[1]    Criminal Law ⟳⟳ Review De Novo**

On appeal from denial of motion to suppress, appellate court reviews the district court's legal conclusions de novo.

1 Case that cites this headnote

**[2]    Customs Duties ⟳⟳ Grounds or cause for stop, search, or seizure**

Border searches are one of those limited situations in which the government's interest in conducting a search without a warrant outweighs the individual's privacy interest; as such, searches at a border, without probable cause and without a warrant, are nonetheless reasonable. U.S. Const. Amend. 4.

4 Cases that cite this headnote

**[3]    Customs Duties ⟳⟳ Grounds or cause for stop, search, or seizure**

Border-search exception to Fourth Amendment is grounded in the sovereign's right to control who and what may enter the country, and for that reason, individuals have limited justifiable expectations of privacy when presenting themselves or their mailed parcels for entry at a border. U.S. Const. Amend. 4.

United States v. Baxter, 951 F.3d 128 (2020)

72 V.I. 1183

[4]    **Customs Duties** 👄 Airports and airplanes

For purposes of border-search exception to Fourth Amendment, "functional equivalent" of an international border may, for instance, be an airport, if the airport is the first point of landing after a nonstop flight from abroad. U.S. Const. Amend. 4.

2 Cases that cite this headnote

[5]    **Search, Seizure, and Arrest** 👄 Subjective or objective test; motive, intent, and pretext

Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis for searches. U.S. Const. Amend. 4.

[6]    **Customs Duties** 👄 Searches and Seizures

As far as the applicability of the border-search exception to Fourth Amendment is concerned, there is no distinction between persons and mailed items. U.S. Const. Amend. 4.

[7]    **Customs Duties** 👄 Grounds or cause for stop, search, or seizure

United States Customs and Border Protection (CBP) agents' warrantless searches of packages defendant allegedly mailed to United States Virgin Islands were permissible under border-search exception to Fourth Amendment; searches were routine customs searches, and it made no difference that packages were leaving mainland United States rather than entering into it. U.S. Const. Amend. 4.

7 Cases that cite this headnote

[8]    **Customs Duties** 👄 Searches and Seizures

Border-search exception to Fourth Amendment applies regardless of the direction of a border crossing. U.S. Const. Amend. 4.

4 Cases that cite this headnote

[9]    **Criminal Law** 👄 Wrongfully obtained evidence

On appeal from denial of motion to suppress, defendant forfeited claims that regulations that authorized United States Customs and Border Protection (CBP) officers' warrantless searches of packages defendant allegedly mailed to United States Virgin Islands constituted violation of nondelegation doctrine and failed to comply with Administrative Procedure Act; defendant never presented claims to district court. U.S. Const. art. 1, § 1; 5 U.S.C.A. §§ 553(b, c), 706(2)(A); 19 C.F.R. §§ 145.1, 145.2.

3 Cases that cite this headnote

**\*129**  On Appeal from the District Court of the Virgin Islands, District Court No. 3-17-cr-00024-001, District Judge: The Honorable Curtis V. Gomez

United States v. Baxter, 951 F.3d 128 (2020)

72 V.I. 1183

**Attorneys and Law Firms**

John M. Pellettieri [ARGUED], United States Department of Justice, Appellate Section, Room 1264, 950 Pennsylvania Avenue, N.W., Washington, DC 20004, Everard E. Potter, Office of United States Attorney, 5500 Veterans Drive, United States Courthouse, Suite 260, St. Thomas, VI 00802, Counsel for Appellant

Joseph A. DiRuzzo, III [ARGUED], Daniel Lader, DiRuzzo & Company 401, East Las Olas Boulevard, Suite 1400, Fort Lauderdale, FL 33301, Michael L. Sheesley, P.O. Box 307728, St. Thomas, VI 00803, Counsel for Appellee

Before: SMITH, Chief Judge, McKEE and SHWARTZ, Circuit Judges

**OPINION OF THE COURT**

SMITH, Chief Judge.

**\*\*1187** Steven Baxter allegedly mailed two packages from South Carolina to St. Thomas, United States Virgin Islands. Upon arrival in St. Thomas, U.S. Customs and Border Protection (CBP) agents opened the packages and discovered that they contained guns. Baxter was apprehended and charged with two counts of illegal transport of a firearm. During his criminal proceeding, he moved to suppress the guns as the fruit of unreasonable searches which violated his Fourth Amendment rights. The District Court of the Virgin Islands agreed and granted the motion to suppress. The Government has appealed.

For the reasons that follow, we conclude that CBP permissibly conducted the searches pursuant to the border-search exception to the Fourth Amendment. Because the searches did not violate Baxter's constitutional rights, we will vacate the order granting the motion to suppress and remand for further proceedings.

I.

A.[1]

On March 31, 2017, CBP K-9 Officer Joseph Lopez was working at the Cyril E. King Airport in St. Thomas with his trained and certified canine, Bo. Per his routine daily duties, Lopez brought Bo into **\*130** a cargo plane to inspect mail that was incoming to the Virgin Islands (also, "the VI"). Bo alerted to a package, signaling in a manner indicating the presence of drugs. The package purportedly had been sent by Jason Price, whose address was in South Carolina, and had been mailed to a Mekelya Meade in St. Thomas. It was labeled priority mail and weighed 3 pounds 2.2 ounces.

Officer Lopez reported the package to CBP Officer Richard Kouns, who removed it from the plane. Officer Kouns opened the box and brought out a piece of clothing that smelled strongly of marijuana, although no drugs were found in the package. When Officer Kouns **\*\*1188** returned the item to the box, a magazine and round of ammunition fell to the floor. The officers inspected the package more thoroughly and discovered the unassembled parts of a gun.

A few days later, on April 3, 2017, a postal inspector contacted CBP regarding another package which bore the same names and addresses as the March 31 package.[2] Officers Lopez and Kouns responded to the call and procured the package. Because of the addresses and the weight of the package,[3] Officer Kouns suspected it might contain another gun and decided to x-ray it. The x-ray revealed items that appeared to be a gun and ammunition. Officer Kouns then opened the package and discovered what were indeed a gun and ammunition.

72 V.I. 1183

The CBP officers contacted Homeland Security. Homeland Security Special Agent Alicia Blyden arranged a controlled delivery of the two packages. Authorities ultimately apprehended Steven Baxter as the alleged sender of the packages, and a grand jury charged him with two counts of illegal transport of a firearm under 18 U.S.C. § 922(a)(5).

**B.**

Baxter moved to suppress the guns, claiming that CBP's warrantless searches of the two packages violated his Fourth Amendment rights.[4] After a hearing, the District Court initially denied suppression with respect to the March 31, 2017 search and ordered additional briefing as to the April 3, 2017 search. Subsequently, on November 26, 2018, the District Court vacated its earlier partial denial and issued a detailed forty-two page opinion granting the suppression motion in its entirety.  **\*\*1189** *United States v. Baxter*, No. 2017-24, 2018 WL 6173880 (D.V.I. Nov. 26, 2018).

In its opinion, the District Court observed that the packages sent from South Carolina to St. Thomas "never left United States territory." *Id.* at \*8. The District Court posited that, under the Fourth Amendment, the packages "remain protected from a warrantless search unless **\*131** ... they are transferred to a foreign territory."[5] *Id.* at \*7. The District Court acknowledged that, while the Virgin Islands is not a "foreign territory" or a "foreign country," *id.* at \*7–\*9, nonetheless "[a]rguably ..., some type of border—or an approximation of one—exists" between the mainland United States and the VI for certain customs purposes. *Id.* at \*14. But it concluded that searches at that customs border for purposes of enforcing customs laws are less important "than the interest of the United States in enforcing its own Constitution."[6] *Id.*

Our Court's decision in *United States v. Hyde*, 37 F.3d 116 (3d Cir. 1994), established the applicability of the border-search exception to the Fourth Amendment at the customs border between the mainland United States and the Virgin Islands.[7] Because the border-search exception permits the Government to conduct warrantless searches at the **\*\*1190** Virgin Islands customs border, the District Court had to distinguish *Hyde*. It did so by relying on the direction that the packages were traveling—*i.e.*, from the mainland to the Virgin Islands—not from the Virgin Islands to the mainland, as was the case in *Hyde*.

According to the District Court, 19 U.S.C. § 1467[8] authorizes customs inspections of persons and items upon entry *into* **\*132** the United States, but "[t]he Court is aware of no statutory authority authorizing similar inspections of persons or items entering the United States Virgin Islands from the United States mainland." *Baxter*, 2018 WL 6173880, at \*15. In addition, the District Court weighed the interests at play and concluded that the balance is different than that struck in *Hyde*. The District Court weighed the Government's interest in conducting the searches for customs enforcement purposes against individuals' personal privacy interest in mailed packages and determined "that the government's interest in conducting the type of search at issue here is less compelling than the government's interest in conducting the searches at issue in *Hyde*. In addition, the intrusion on privacy here is more significant than the intrusion presented in *Hyde*." *Id.* at \*14 n.7. Thus, it concluded that, when traveling *into* the Virgin Islands, the personal interest prevails, and "the warrantless searches of the sealed mail packages in this matter were not reasonable." *Id.*

The District Court reiterated, "[i]t is axiomatic that those things that originate in, and stay within, the territory of the United States remain free from border searches." *Id.* at \*15. Accordingly, the District Court granted Baxter's motion to suppress the firearms.

**\*\*1191** II.

**A.**

72 V.I. 1183

[1]    The Government timely appealed. We have jurisdiction over the Government's appeal of the order suppressing evidence pursuant to 18 U.S.C. § 3731. We review the District Court's legal conclusions *de novo*. *See Hyde*, 37 F.3d at 118.

B.

Because we disagree with the District Court's conclusion that *Hyde* is inapposite, we begin by turning our attention to that case. In *Hyde*, three individuals were attempting to board a flight from St. Thomas to Miami, Florida. After the individuals were stopped by Customs, inspectors conducted pat-downs and discovered cocaine taped to their bodies under their clothes. The defendants moved to suppress the cocaine as the fruit of unconstitutional searches. The District Court granted the suppression motions. On appeal, the Government argued that the warrantless searches were constitutional under the border-search exception to the Fourth Amendment. We agreed, concluding that an individual "may be subjected to a routine customs search prior to departure in the absence of any degree of suspicion that the individual is engaged in wrongdoing." 37 F.3d at 118.

[2]    We first acknowledged the general rule that "warrantless searches are presumptively unreasonable." *Id.* (quoting *Horton v. California*, 496 U.S. 128, 133, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990)). But we also pointed out that searches at a border are, and always have been, a fundamentally different category of search. Border searches are one of those "limited situations [in which] the government's interest in conducting a search without a warrant outweighs the individual's privacy interest." *Id.* As such, "searches at a border, without probable cause and without a warrant, are nonetheless 'reasonable.' " *Id.* at 118. Indeed, we reasoned that going back to our country's founding, the very first Congress—the same Congress that proposed the Bill of Rights—specifically authorized warrantless border searches for the purpose of collecting customs duties, and "did not intend such searches to come within the prohibitions of the Fourth Amendment." *Id.* at 119.

*133    [3]    We observed in *Hyde* that the Supreme Court has recognized, explained, and reaffirmed the border-search exception in several cases. **1192 *See id.* at 119–20 (citing cases). Historically, the Government's broad power to conduct border searches has been necessary to prevent smuggling and to prevent prohibited articles from entering the country. *See United States v. 12 200-Ft. Reels of Super 8MM Film*, 413 U.S. 123, 125, 93 S.Ct. 2665, 37 L.Ed.2d 500 (1973). Border-search jurisprudence demonstrates that the Supreme Court has "faithfully adhered to" the view that "border searches were not subject to the warrant provisions of the Fourth Amendment and were 'reasonable' within the meaning of that Amendment." *United States v. Ramsey*, 431 U.S. 606, 617, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977). The border-search exception is grounded in the sovereign's right to control "who and what may enter the country," and for that reason, individuals have "limited justifiable expectations of privacy" when presenting themselves or their mailed parcels for entry at a border.[9] *Id.* at 620, 623 n.17, 97 S.Ct. 1972. Thus, the balance between an individual's lesser expectation of privacy at a border tilts more favorably to the Government, which has a heightened interest in regulating the collection of duties and preventing the entry of contraband. *See United States v. Montoya de Hernandez*, 473 U.S. 531, 537, 539–40, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985).

[4]    We acknowledged in *Hyde* that the Supreme Court has applied the border-search exception only when an international boundary "or its functional equivalent"[10] is at play. *Hyde*, 37 F.3d at 120. The border between the United States and the Virgin Islands is neither an international boundary nor its functional equivalent, and so the Supreme Court's border-search exception cases did not, by themselves, control our decision in *Hyde*. *Id.* at 122. Nonetheless, we decided that the rationale of the Supreme Court's international border-search cases applies with equal force at the customs border that Congress established between the mainland United States and the Virgin Islands.[11] *Id.*

**1193    Like searches at an international border, routine warrantless searches at the Virgin Islands customs border would serve the United States' interest in regulating its customs system. *Id.* "Routine warrantless border searches without probable cause would appear to be as essential to the accomplishment of the objects of that customs border as similar traditional searches have universally been recognized to be to the objectives of traditional customs systems *134 at international borders." *Id.* And, on "the other side of the balance," we observed that individuals at the customs border, like at an international border, have a lesser

United States v. Baxter, 951 F.3d 128 (2020)

72 V.I. 1183

privacy expectation than they would within the mainland United States. *Id.* Thus, the searches of the *Hyde* defendants were reasonable and did not offend the Fourth Amendment. *Id.*

We completed our analysis in *Hyde* with the observation that the application of the border-search exception at the customs border is consistent with the protections of the Fourth Amendment, which apply *within* the territory of the Virgin Islands. *See* Revised Organic Act of 1954, 48 U.S.C. § 1561 ("The right to be secure against unreasonable searches and seizures shall not be violated. No warrant for arrest or search shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized."). The existence of Fourth Amendment protections within the Virgin Islands does not undermine Congress's ability to direct that a customs border exists *between* the United States mainland and the Virgin Islands and to protect that customs border by conducting searches that are "essential to the effective surveillance of the customs border and to the efficient collection of the duties Congress had imposed." *Hyde*, 37 F.3d at 123.

[5]    [6]    In sum, *Hyde* established that the border-search exception to the Fourth Amendment permits routine warrantless customs searches at **1194 the customs border between the mainland United States and the Virgin Islands.[12] *Hyde*'s vitality is undiminished today.

## C.

[7]    [8]    The routine customs searches of Baxter's packages were reasonable under *Hyde* unless, as the District Court held, it makes a difference that the packages were leaving the mainland United States rather than entering into it.[13] We conclude that this directional distinction should have made no material difference to the District *135 Court's analysis. The border-search exception applies regardless of the direction of a border crossing.

In *United States v. Ezeiruaku*, 936 F.2d 136 (3d Cir. 1991), we considered the applicability of the border-search exception to searches of luggage traveling across the international border out of the United States. Specifically, customs inspectors at the Philadelphia International Airport conducted a warrantless search of Ezeiruaku's suitcases, which were **1195 about to be loaded onto an outgoing flight to Frankfurt, Germany.[14] The inspectors discovered $265,000 of unreported cash in one suitcase. Ezeiruaku was charged with one count of exporting unreported currency, and he moved to suppress the cash as fruit of an unconstitutional search. The District Court granted the motion.

We reversed, rejecting Ezeiruaku's claim that the border-search exception does not apply to articles leaving the United States. *Id.* at 143. Consistent with every Court of Appeals to have considered the issue, we concluded that "the traditional rationale for the border search exception applies as well in the outgoing border search context."[15] *Id.* Thus, "[b]ecause the luggage ... was at the functional equivalent of the border, we [held] that no warrant, reasonable suspicion or probable cause was needed to justify the search." *Id.*

Baxter is correct in observing that the Supreme Court's border-search cases primarily discuss the United States' interest in protecting its borders from illicit entry of persons and goods *into* the United States. *See, e.g., Ramsey*, 431 U.S. at 620, 97 S.Ct. 1972. This observation does not, however, undermine the policy reasons we took into account in *Ezeiruaku* that justify applying the border-search exception to any border crossing, regardless of the direction. The United States has an interest in monitoring persons and items that exit the country as well as those that enter it. *Ezeiruaku*, 936 F.2d at 143.

Indeed, in both *Hyde* and *Ezeiruaku*, we drew support for our conclusions based on public policy concerns. We recognized in *Hyde* that the United States has an interest in regulating commerce to enforce its customs border with the Virgin Islands. *See Hyde*, 37 F.3d at 122. This interest applies to goods and currency both entering and leaving the mainland by crossing that customs border. Moreover, we observed in **1196 *Ezeiruaku* that the Government's concern with the influx of illicit items into the United States, such as drugs or similar contraband, gives rise to a parallel interest in monitoring the outflow of

72 V.I. 1183

unreported cash that may be supporting the illegal narcotics trade. 936 F.2d at 143. So, even though drug trade was not at issue in Ezeiruaku's case, "in an environment that sees a massive importation of drugs across our borders, ... [s]trong dictates of public policy reinforce the necessity of identifying, if not monitoring or controlling, a cash outflow from the country as well as an influx of narcotics into the country." **\*136** *Id.* The United States has similar interests at the Virgin Islands customs border.[16]

Thus, under *Ezeiruaku*, the direction of travel does not impact the applicability of the border-search exception. The District Court erred in concluding otherwise.

**D.**

Apart from his Fourth Amendment claim, Baxter also contends that the regulations that authorized the CBP officers' searches of the mailed packages are unconstitutional and invalid for failure to comply with the Administrative Procedure Act.[17] Baxter challenges: (1) 19 C.F.R. § 145.1, a regulation that defines certain classes of mail; (2) 19 C.F.R. § 145.2, which authorizes, *inter alia,* customs examination of "all mail arriving from outside the U.S. Virgin Islands which is to be delivered within the U.S. Virgin Islands"; and (3) United States Postal Service Domestic Mail Manual § 101.6.1, which provides that mail weighing over 13 ounces is "priority mail." When considered in tandem, these three regulations authorized CBP officers to conduct the customs searches of the two packages here.[18]

Baxter argues that these provisions are invalid for three reasons: the regulations (1) were issued in the absence of proper notice and comment **\*\*1197** procedures, 5 U.S.C. § 553(b), (c); (2) are arbitrary and capricious, 5 U.S.C. § 706(2)(A); and (3) constitute a violation of the nondelegation doctrine. The Government vigorously disputes each of these claims.

 **[9]**   Baxter concedes, as he must, that he never presented these claims to the District Court, and so the District Court was never given the opportunity to consider them. These arguments could and should have been presented to the District Court in the first instance. Because these issues were asserted for the first time on appeal, we deem them forfeited and will not consider them. *See Gov't of the V.I. v. Rosa,* 399 F.3d 283, 291 (3d Cir. 2005).

**III.**

Border searches "have a unique status in constitutional law." *Ezeiruaku,* 936 F.2d at 142 (quoting *United States v. Vega-Barvo,* 729 F.2d 1341, 1344 (11th Cir. 1984). Indeed, the "longstanding recognition that searches at our borders without probable cause and without a warrant are nonetheless 'reasonable' has a history as old as the Fourth Amendment itself." *Ramsey,* 431 U.S. at 619, 97 S.Ct. 1972.

The searches of the two packages here, which occurred at the Virgin Islands customs border, were routine customs searches that were reasonable under the border-search exception to the Fourth Amendment. *See Hyde,* 37 F.3d at 122; *Ezeiruaku,* 936 F.2d at 143. Because the searches did not violate Baxter's Fourth Amendment rights, the District Court erred by suppressing the fruit of those searches. We therefore will vacate the **\*137** judgment and remand the matter to the District Court.

**All Citations**

951 F.3d 128, 72 V.I. 1183

**Footnotes**

1       The factual background is derived from the testimony presented during the June 4, 2018 suppression hearing.

2      Two packages bearing these names were intercepted on April 3, 2017, but for present purposes, only one of the two (the package containing a gun) is relevant.

3      While the record does not contain information specifying its precise weight, the second package weighed more than 13 ounces.

4      Before the District Court, the Government argued that Baxter lacked standing to challenge the searches because he lacked an expectation of privacy. Under its theory, because the packages were sent under the name Jason Price, only Price would have a legitimate expectation of privacy in the packages. The District Court rejected the Government's claim. On appeal, the Government has not pursued the standing issue. The standing inquiry for challenging a search under the Fourth Amendment is not a jurisdictional matter and therefore can be waived. *See United States v. Stearn*, 597 F.3d 540, 551 & n.11 (3d Cir. 2010). Because the Government has waived the issue on appeal, we will not consider whether Baxter has standing to challenge the searches. *See United States v. Joseph*, 730 F.3d 336, 341 (3d Cir. 2013).

5      The District Court observed that an exception applies if the warrantless search is conducted by a non-government agent, but such an exception is irrelevant to Baxter's case.

6      The United States' interest in enforcing the Fourth Amendment is not typically considered when courts consider the balance of rights under the Fourth Amendment. Rather, the familiar balancing test weighs the Government's interest in conducting a search versus an individual's interest in being free from a search. *See Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) ("[T]here is no ready test for determining reasonableness [of a search] other than by balancing the need to search (or seize) against the invasion which the search (or seizure) entails." (citation omitted)).

7      Following the Supreme Court's lead, *Hyde* framed the Government's power to conduct warrantless border searches as an "exception" to the Fourth Amendment's warrant requirement. *See, e.g.*, 37 F.3d at 119–20 (citing *United States v. Montoya de Hernandez*, 473 U.S. 531, 537, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985), *United States v. Ramsey*, 431 U.S. 606, 620, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977), and *United States v. 12 200-Ft. Reels of Film*, 413 U.S. 123, 125, 93 S.Ct. 2665, 37 L.Ed.2d 500 (1973)). Our reading of those cases suggests, however, that this is an imperfect locution: a border search is not an "exception" carved out from the Fourth Amendment's application, but rather a border search is a circumstance in which the Fourth Amendment was never intended to apply. *See Hyde*, 37 F.3d at 119 ("The inapplicability of the Fourth Amendment to border searches was, to the [*Ramsey*] Court, evident: 'That searches made at the border, pursuant to the long-standing right of the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border. ...' " (quoting 431 U.S. at 616, 97 S.Ct. 1972)). Nonetheless, for consistency's sake, we employ the "exception" terminology here.

8      Section 1467 provides: "Whenever a vessel from a foreign port or place or from a port or place in any Territory or possession of the United States arrives at a port or place in the United States or the Virgin Islands, whether directly or via another port or place in the United States or the Virgin Islands, the appropriate customs officer for such port or place of arrival may, under such regulations as the Secretary of the Treasury may prescribe and for the purpose of assuring compliance with any law, regulation, or instruction which the Secretary of the Treasury or the Customs Service is authorized to enforce, cause inspection, examination, and search to be made of the persons, baggage, and merchandise discharged or unladen from such vessel, whether or not any or all such persons, baggage, or merchandise has previously been inspected, examined, or searched by officers of the customs."

9      In *Ramsey*, the Supreme Court concluded that the border-search exception applies to mailed letters in the same way it applies to individuals. *See Ramsey*, 431 U.S. at 620, 97 S.Ct. 1972.

10     The "functional equivalent" of an international border may, for instance, be an airport, if the airport is the first point of landing after a nonstop flight from abroad. *Hyde*, 37 F.3d at 120 n.2 (citing *United States v. Caminos*, 770 F.2d 361, 364 (3d Cir. 1985)).

11     The Virgin Islands is an "unincorporated American territory." *See Vooys v. Bentley*, 901 F.3d 172, 176 (3d Cir. 2018) (en banc). That is, the VI has not been "incorporated" into the United States on a path to statehood. *Id.* at 176 n.10. Because of its unincorporated territory status, Congress "has the authority to create a border for customs purposes" between the VI and the rest of the country. *Hyde*, 37 F.3d at 121. Consistent with that authority, in the Tariff Act of 1930 (which remains in effect today), Congress specified that the customs territory of the United States excludes the Virgin Islands. *Id.*; *see* 19 U.S.C. § 1401(h) ("The term 'United States' includes all Territories and possessions of the United States except the Virgin Islands, American Samoa, Wake Island, Midway Islands, Kingman Reef, Johnston Island, and the island of Guam.").

12    *Hyde* held that warrantless searches at the customs border are constitutionally permissible for the purpose of surveillance of that border and collection of customs duties. In Baxter's case, however, it is immaterial whether the CBP officers conducted the searches of Baxter's packages for the specific purposes that were discussed in *Hyde*. Rather, as the Supreme Court held in *Whren v. United States*, "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). Moreover, although *Hyde* concerned searches of individuals who were crossing the customs border, *Hyde*'s rationale applies to mailed packages as well. As the Supreme Court made clear in *Ramsey*, as far as the applicability of the border-search exception is concerned, there is no distinction between persons and mailed items. *See Ramsey*, 431 U.S. at 620, 97 S.Ct. 1972 ("The critical fact is that the envelopes cross the border and enter this country, not that th[ey] are brought in by one mode of transportation rather than another. It is their entry into this country from without that makes a resulting search 'reasonable.' ").

13    Neither party has suggested that CBP's searches of Baxter's packages qualify as anything other than routine customs searches. We are aware that appellate courts have held that a customs search that poses a serious invasion of privacy and that would offend the average traveler—like a body-cavity or strip search—is non-routine and thus subject to heightened Fourth Amendment scrutiny. *United States v. Whitted*, 541 F.3d 480, 485–86 (3d Cir. 2008) (collecting cases); *United States v. Johnson*, 991 F.2d 1287, 1291 (7th Cir. 1993). The searches of the mailed packages here fall far below that level of intrusion. Accordingly, there is no need for us to consider what constitutional requirements apply to a non-routine customs search. *See id.* ("When a border search and seizure becomes nonroutine, a customs official needs reasonable suspicion to justify it.").

14    Because it was the last point of departure before an international flight, the Philadelphia International Airport was the functional equivalent of an international border. *Ezeiruaku*, 936 F.2d at 139.

15    At the time *Ezeiruaku* was decided, the Second, Fifth, Eighth, Ninth, and Eleventh Circuit Courts of Appeals had held that the border-search exception applies regardless of the direction of the border crossing. *See Ezeiruaku*, 936 F.2d at 141–43. Since then, the First, Fourth, and Sixth Circuit Courts of Appeals have joined the consensus. *See United States v. Boumelhem*, 339 F.3d 414, 422 (6th Cir. 2003); *United States v. Beras*, 183 F.3d 22, 26 (1st Cir. 1999); *United States v. Oriakhi*, 57 F.3d 1290, 1297 (4th Cir. 1995). We are aware of no Court of Appeals to have reached a contrary conclusion.

16    Indeed, the United States has an additional interest in protecting its territories from the entry of illicit items like drugs and guns.

17    Baxter does not claim that the CBP officers violated any applicable statute or regulation in conducting the searches.

18    Due to their weight, Baxter's packages qualified as "priority mail," not "first class mail," which is described in USPS Domestic Mail Manual § 101.6.1, or as "sealed letter class mail," described in 19 C.F.R. § 145.1. By regulation, first class mail and sealed letter class mail are subject to heightened requirements prior to customs inspection. *See* 19 C.F.R. § 145.3(b), (e). The packages at issue here did not qualify for the benefit of those heightened protections and therefore were subject to customs inspection under 19 C.F.R. § 145.2.

---

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:24-cv-00086-TMR    Document 19    Filed 01/22/25    Page 39 of 63    Baxter Amicus

UNITED STATES OF AMERICA, Plaintiff-Appellant, v...., 2020 WL 1969619...

2020 WL 1969619 (C.A.3) (Appellate Brief)
United States Court of Appeals, Third Circuit.

UNITED STATES OF AMERICA, Plaintiff-Appellant,

v.

Steven BAXTER, Defendant-Appellee.

No. 18-3613.
April 13, 2020.

On Appeal from the United States District Court of the Virgin
Islands, Division of St. Thomas & St. John, Case No. 3:17-cr-00024,
Hon. Curtis V. Gómez, District Judge

**Brief of Amicus Curiae Virgin Islands Bar Association in Support of Appellee's Petition for Rehearing**

Dwyer Arce, Kutak Rock LLP, The Omaha Building, 1650 Farnam Street, Omaha, Nebraska 68102, (402) 346-6000, Dwyer.Arce@KutakRock.com, for Amicus Curiae Virgin Islands Bar Association.

**\*2 TABLE OF CONTENTS**

I. INTERESTS OF AMICUS CURIAE ................................................................ 6
II. ARGUMENT ................................................................ 8
A. *Hyde* and *Baxter* extend the *Insular Cases* to deny fundamental rights in the Virgin Islands ................... 8
B. The Fourth Amendment applies in the Virgin Islands in the same way it applies in a state ..................... 9
C. The Fourteenth Amendment incorporation doctrine undermines the validity of the incorporation doctrine of the *Insular Cases* ................................................................ 11
III. CONCLUSION ................................................................ 13

**\*3 TABLE OF AUTHORITIES**
**FEDERAL CASES**

*Aguilar v. Texas*, 378 U.S. 108 (1964) ................................................ 12
*Armstrong v. United States*, 182 U.S. 243 (1901) ................................ 8
*Aurelius Inv., LLC v. Puerto Rico*, 915 F.3d 838 (1st Cir.), *cert. granted*, 2019 WL 1790539 (U.S. 2019) ........................ 9, 11, 13
*Balzac v. Porto Rico*, 258 U.S. 298 (1922) ........................................ 8
*Benton v. Maryland*, 395 U.S. 784 (1969) .......................................... 12
*Boumediene v. Bush*, 553 U.S. 723 (2008) .......................................... 7
*Cantwell v. Connecticut*, 310 U.S. 296 (1940) .................................... 12
*David Kaufman & Sons Co. v. Smith*, 216 U.S. 610 (1910) ................ 8
*De Lima v. Bidwell*, 182 U.S. 1 (1901) ............................................... 8
*DeJonge v. Oregon*, 299 U.S. 353 (1937) ........................................... 12
*Dooley v. United States*, 182 U.S. 222 (1901) .................................... 8
*Dorr v. United States*, 195 U.S. 138 (1904) ....................................... 8
*Downes v. Bidwell*, 182 U.S. 244 (1901) ............................................ 8
*Duncan v. Louisiana*, 391 U.S. 145 (1968) ....................................... 12--13
*Edwards v. South Carolina*, 372 U.S. 229 (1963) ............................. 12
*Everson v. Bd. of Ed. of Ewing Twp.*, 330 U.S. 1 (1947) ................... 12
**\*4** *Gitlow v. New York*, 268 U.S. 652 (1925) .............................. 11
*Hawaii v. Mankichi*, 190 U.S. 197 (1903) ......................................... 8, 13
*Mapp v. Ohio*, 367 U.S. 643 (1961) .................................................. 12
*McDonald v. City of Chicago*, 561 U.S. 742 (2010) .......................... 12
*Near v. Minnesota*, 283 U.S. 697 (1931) ........................................... 12

Case 1:24-cv-00086-TMR    Document 19    Filed 01/22/25    Page 39 of 63

UNITED STATES OF AMERICA, Plaintiff-Appellant, v...., 2020 WL 1969619...

*Ocampo v. United States*, 234 U.S. 91 (1914) ...................................................... 8
*Timbs v. Indiana*, 139 S. Ct. 682 (2019) ............................................................. 11--12
*Torres v. Puerto Rico*, 442 U.S. 465 (1979) ........................................................ 9--10
*United States v. Baxter*, 951 F.3d 128 (3d Cir. 2020) .......................................... 6--10, 14
*United States v. Hyde*, 37 F.3d 116 (3d Cir. 1994) .............................................. 6--10, 14
*United States v. Tiede*, 86 F.R.D. 227 (U.S. Ct. Berlin 1979) ................................ 13

**FEDERAL STATUTES**
Revised Organic Act of 1954, 48 U.S.C. § 1561 .................................................. 9--10

**OTHER AUTHORITIES**
Fed. R. App. P. 29(a)(2) ..................................................................................... 6
Fed. R. App. P. 29(a)(4)(E) ................................................................................. 6
Fed. R. App. P. 29(b)(4) ..................................................................................... 15
Fed. R. App. P. 29(c) ......................................................................................... 15
Fed. R. App. P. 32(a) ......................................................................................... 15
Local Appellate Rule 28.3(d) .............................................................................. 15
Local Appellate Rule 31.1(a) .............................................................................. 16
Local Appellate Rule 31.1(c) .............................................................................. 16
Local Appellate Rule 31.1(d) .............................................................................. 17
Local Appellate Rule 32.1 ................................................................................... 15
U.S. Const. amend. I ......................................................................................... 11
U.S. Const. amend. I through X .......................................................................... 11--13
**\*5** U.S. Const. amend. II .............................................................................. 12
U.S. Const. amend. IV ....................................................................................... 8--10, 12
U.S. Const. amend. V ......................................................................................... 12
U.S. Const. amend. VI ....................................................................................... 12--13
U.S. Const. amend. VIII ..................................................................................... 12
U.S. Const. amend. XIV ..................................................................................... 11, 13
U.S. Const. amend. XIV § 1 .............................................................................. 12
U.S. Const. art. IV, § 3, cl. 2 ............................................................................. 9

## *6 I. INTERESTS OF AMICUS CURIAE

The Virgin Islands Bar Association is an integrated bar association with hundreds of members practicing law in the "unincorporated" territory of the Virgin Islands of the United States. The Bar Association operates with the mission of advancing the administration of justice, enhancing access to justice, and advocating public policy positions for the benefit of the judicial system, its members, and the people of the Virgin Islands.[1]

In fulfillment of its duties, the Bar Association submits this brief as amicus curiae urging the Court to grant the petition for rehearing and set aside the decision in *United States v. Baxter*, 951 F.3d 128 (3d Cir. 2020). The Bar Association's duty to intervene in this matter as an advocate for the people of the Virgin Islands is demonstrated by *Baxter's* heavy reliance on *United States v. Hyde*, 37 F.3d 116 (3d Cir. 1994). In *Hyde*, this Court relied on the *Insular Cases* and the status of the Virgin Islands as "an unincorporated territory of the United States," 37 F.3d at 121, to announce a categorical rule that Americans traveling between the Virgin Islands **\*7** and the mainland United States have "the reasonable expectations of individual privacy" that are not "materially greater than the reasonable privacy expectations of travelers at an international border." *Hyde*, 37 F.3d at 122.

This Court's decisions in *Hyde* and *Baxter* represent an expansion of the *Insular Cases* far beyond what Supreme Court precedent requires, further extending a long line of cases denying fundamental constitutional rights to Americans living in the Virgin Islands and other U.S. territories.

The Bar Association urges this Court to grant rehearing and send a clear message: Americans anywhere are Americans everywhere. The Court must reaffirm the basic principle that an American's freedom from unreasonable search and seizure cannot be "switch[ed] . . . on or off at will" by the arbitrary decisions of federal authorities. *Boumediene v. Bush*, 553 U.S. 723, 727 (2008).

Case 1:24-cv-00086-TMR    Document 19    Filed 01/22/25    Page 40 of 63

UNITED STATES OF AMERICA, Plaintiff-Appellant, v...., 2020 WL 1969619...

**\*8  II. ARGUMENT**

**A.** *Hyde* **and** *Baxter* **extend the** *Insular Cases* **to deny fundamental rights in the Virgin Islands.**

*Baxter* explained its result was dictated by *Hyde*, which "established that the border-search exception to the Fourth Amendment permits routine warrantless customs searches at the customs border between the mainland United States and the Virgin Islands." *Baxter*, 951 F.3d at 134. Going beyond simply applying circuit precedent, *Baxter* endorsed it, commenting that "*Hyde's* vitality is undiminished today." *Id.*

Although *Baxter* does not directly reference or cite the *Insular Cases*, *Hyde* does. *Hyde* relied heavily on the fact that "[t]he Virgin Islands [is] an unincorporated territory of the United States" under the *Insular Cases* in holding "that warrantless searches at the customs border are constitutionally permissible for the purpose of surveillance of that border and collection of customs duties." *Id.* at 134 n.12 (discussing *Hyde*); *see also Hyde*, 37 F.3d at 120 (citing *Downes v. Bidwell*, 182 U.S. 244, 300 (1901), and *David Kaufman & Sons Co. v. Smith*, 216 U.S. 610, 611 (1910)).[2]

**\*9**  So even without explicit discussion of the *Insular Cases* in *Baxter*, this "discredited lineage of cases . . . hovers like a dark cloud over this case." *Aurelius Inv., LLC v. Puerto Rico*, 915 F.3d 838, 855 (1st Cir.), *cert. granted*, 2019 WL 1790539 (U.S. 2019).

**B. The Fourth Amendment applies in the Virgin Islands in the same way it applies in a state.**

*Baxter* explained that this Court "completed [its] analysis in *Hyde* with the observation that the application of the border-search exception at the customs border is consistent with the protections of the Fourth Amendment, which apply *within* the territory of the Virgin Islands" under the Revised Organic Act of 1954. 951 F.3d at 134 (citing Revised Organic Act of 1954, 48 U.S.C. § 1561) (emphasis in original). This attempt to distinguish the operation of the Fourth Amendment in the Virgin Islands versus the mainland United States must fail.

Like the Virgin Islands, "Puerto Rico [is] an unincorporated territory where the Territorial Clause endows Congress with plenary powers." *Aurelius*, 915 F.3d at 848. Yet the Supreme Court unequivocally "conclude[d] that the constitutional requirements of the Fourth Amendment apply to [Puerto Rico]" directly, even without Congress explicitly extending it via federal statute. *Torres v. Puerto Rico*, 442 U.S. 465, 471 (1979). There is no reason the Fourth Amendment would not equally apply of its own force to the "unincorporated" territory of the Virgin Islands.

**\*10**  So while *Baxter* observed "the protections of the Fourth Amendment . . . apply *within* the territory of the Virgin Islands." 951 F.3d at 134 (citing 48 U.S.C. § 1561) (emphasis in original), this is a distinction without a difference. Just as the Fourth Amendment "appl[ies] *within* the territory of the Virgin Islands," it also applies *within* the territory of each of the 50 states. Yet travelers flying from one state to another are not subject to warrantless searches upon arrival. The result should be the same with respect to those travelers going to or coming from one of the states to the Virgin Islands--the Fourth Amendment applies equally *within* both.

The lack of contiguity between the mainland United States and the Virgin Islands makes no difference to this analysis. As the Supreme Court explained regarding other noncontiguous parts of the United States, a territory "is not unique because it is an island . . . neither Alaska nor Hawaii are contiguous to the continental body of the United States." *Torres*, 442 U.S. at 474.[3]

**\*11  C. The Fourteenth Amendment incorporation doctrine undermines the validity of the incorporation doctrine of the** *Insular Cases.*

UNITED STATES OF AMERICA, Plaintiff-Appellant, v...., 2020 WL 1969619...

This Court, sitting as a panel or en banc, "lack[s] the authority to" "reverse the 'Insular Cases.' " *Aurelius*, 915 F.3d at 855. Nonetheless, substantial changes in Supreme Court jurisprudence have undermined the entire framework on which the *Insular Cases* are built, rendering *Hyde's* reliance on those cases unwarranted.

The main consequence of the *Insular Cases* is that Americans living in "unincorporated" U.S. territories don't enjoy the same constitutional rights as Americans in the states until the territory is "incorporated" into the United States. This seems entirely anomalous today (particularly because the territorial incorporation doctrine has no basis in the text of the Constitution). But it may not have seemed so strange in the early 1900s, when even Americans living in states had no federal constitutional rights with respect to their state governments.

"When ratified in 1791, the Bill of Rights applied only to the Federal Government." *Timbs v. Indiana*, 139 S. Ct. 682, 687 (2019). And when the *Insular Cases* were decided in the early 1900s, the Supreme Court had yet to hold that the Bill of Rights restricted the authority of state governments by virtue of the Fourteenth Amendment incorporation doctrine. The Bill of Rights wasn't applied to state governments until many years later, with the Supreme Court subjecting state governments to the requirements of the First Amendment for the first time in 1925. *Gitlow v. New York*, 268 U.S. 652 (1925) (incorporating right to free speech); *see* **\*12** *also Near v. Minnesota*, 283 U.S. 697 (1931) (freedom of the press); *DeJonge v. Oregon*, 299 U.S. 353 (1937) (assembly); *Cantwell v. Connecticut*, 310 U.S. 296 (1940) (free exercise of religion); *Everson v. Bd. of Ed. of Ewing Twp.*, 330 U.S. 1 (1947) (prohibition against establishment of religion); *Edwards v. South Carolina*, 372 U.S. 229 (1963) (right to petition for redress of grievances).

Since then, "[w]ith only 'a handful' of exceptions, this Court has held that the Fourteenth Amendment's Due Process Clause incorporates the protections contained in the Bill of Rights, rendering them applicable to the States." *Timbs*, 139 S. Ct. at 687. This includes the Fourth Amendment in the 1960s. *Mapp v. Ohio*, 367 U.S. 643 (1961) (incorporating prohibition on unreasonable search and seizure); *Aguilar v. Texas*, 378 U.S. 108 (1964) (warrant requirement). Same with the Fifth and Sixth Amendments. *Benton v. Maryland*, 395 U.S. 784 (1969) (right against double jeopardy); *Duncan v. Louisiana*, 391 U.S. 145 (1968) (right to a jury trial). The Second Amendment in 2010, *McDonald v. City of Chicago*, 561 U.S. 742 (2010), and the Eighth Amendment prohibition on excessive fines last year. *Timbs*, 139 S. Ct. 682.

So there was at least some logic to holding that Congress was not restricted by the Bill of Rights when acting with the power of a state government with respect to a territory, because when the *Insular Cases* were decided, a state government was likewise not restricted by the Bill of Rights. The *Insular Cases* even acknowledged **\*13** this distinction in *Mankichi*, noting that "we have also held that the states, when once admitted as such, may dispense with grand juries," when holding a territorial criminal prosecution did not require a grand jury. 190 U.S. at 211.

But this underlying rationale is gone now that nearly all of the Bill of Rights has been incorporated against the states through the Fourteenth Amendment. This was recognized by a federal judge in 1979, where it was noted that "the holdings in the *Insular Cases* that trial by jury in criminal cases was not 'fundamental' in American law . . . was thereafter authoritatively voided in *Duncan*," which incorporated the Sixth Amendment right to a jury trial against the states. *United States v. Tiede*, 86 F.R.D. 227 (U.S. Ct. Berlin 1979) (holding that Germans living in American-occupied post-war Berlin "charged with criminal offenses [by the United States] have constitutional rights, including the right to a trial by jury").

The Supreme Court appears to have never revisited this aspect of the *Insular Cases* after development of the Fourteenth Amendment's incorporation doctrine, but this Court is not foreclosed from doing so.

### III. CONCLUSION

The continued application of the *Insular Cases* to deny fundamental constitutional rights to Americans in the Virgin Islands is yet another "further expansion" of the "discredited lineage of cases" embodied in the *Insular Cases* that other federal courts

UNITED STATES OF AMERICA, Plaintiff-Appellant, v...., 2020 WL 1969619...

of appeals recently rejected. *See, e.g., Aurelius*, 915 F.3d at 855.  **\*14**  This Court should grant the petition for rehearing and reaffirm the basic rights of Americans living in U.S. territories by acknowledging that *Hyde* and *Baxter* were wrongly decided.

Dated this 13th day of April, 2020.

Respectfully Submitted,

By /s/ Dwyer Arce

Dwyer Arce

Kutak Rock LLP

The Omaha Building

1650 Farnam Street

Omaha, Nebraska 68102

(402) 346-6000

Dwyer.Arce@KutakRock.com

*Counsel for Amicus Curiae*


Footnotes

1    This brief, the positions taken in it, and the Bar Association's decision to file, are not intended to reflect the views of any individual member of the Bar Association. This brief is not intended to reflect the views of the Supreme Court of the Virgin Islands or any of its members. The Bar Association states under Federal Rule of Appellate Procedure 29(a)(4)(E) that no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting this brief; and no person--other than the amicus curiae, its members, or its counsel--contributed money that was intended to fund preparing or submitting this filing. All parties consent to this filing.

2    In addition to *Downes* and *David Kaufman & Sons Co.*, the *Insular Cases* are often said to include *De Lima v. Bidwell*, 182 U.S. 1 (1901), *Dooley v. United States*, 182 U.S. 222 (1901), *Armstrong v. United States*, 182 U.S. 243 (1901), *Balzac v. Porto Rico*, 258 U.S. 298 (1922), *Ocampo v. United States*, 234 U.S. 91 (1914), *Dorr v. United States*, 195 U.S. 138 (1904), and *Hawaii v. Mankichi*, 190 U.S. 197 (1903), among others.

3    *Hyde* attempted to distinguish *Torres*, reasoning it was not relevant because its holding was "that the local government of Puerto Rico had no authority to enact a statute creating a border between Puerto Rico and the rest of the United States, and there was accordingly no justification for recognizing an exception to the general requirement of a warrant." *Hyde*, 37 F.3d at 122. But this distinction ignores the fact that *Torres* established as a matter of constitutional law that the Fourth Amendment applies to unincorporated territories.


**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

STEVEN BAXTER V. UNITED STATES, 20-5133 (2020)


⑤ Baxter Docket

**This docket is current through 01/26/2021**

Today's Date: 1/11/2025
Source: U.S. SUPREME COURT, U.S. SUPREME COURT

**DISCLAIMER**

This Data is provided for informational purposes only and it is not the official record.
For copies of the official record (of an incarceration, conviction or court filing record)
contact the source agency or court. In addition to any obligations under your Subscriber
Agreement, your use of this data may be governed by the **Supplier Additional Terms
(see Footer).**

**CASE INFORMATION**

| | |
|---|---|
| Case Title: | STEVEN BAXTER v. UNITED STATES |
| Court: | U.S. SUPREME COURT |
| Case Number: | 20-5133 |
| Case Type: | APPEAL |
| Key Nature of Suit: | APPEALS (030) |
| Date Filed: | 07/22/2020 |

**LOWER COURT INFORMATION**

| | |
|---|---|
| Lower Court: | UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT |
| Lower Court Case Number: | 18-3613 |
| Lower Court Decision Date: | FEBRUARY 21, 2020 |
| Rehearing Denied: | APRIL 29, 2020 |

**PARTICIPANT INFORMATION**

**STEVEN BAXTERToggle Section**

| | |
|---|---|
| Type: | PETITIONER |
| Attorney: | JOSEPH A. DIRUZZO III |
| Attorney Address: | 401 EAST LAS OLAS BLVD. |
| | SUITE 1400 |
| | FT. LAUDERDALE, FL 33301 |
| Attorney Phone: | (954) 615-1676 |
| Email Address: | JD@DIRUZZOLAW.COM |
| Firm Name: | DIRUZZO & COMPANY |

**UNITED STATESToggle Section**

| | |
|---|---|
| Type: | RESPONDENT |
| Attorney: | JEFFREY B. WALL |
| Attorney Address: | UNITED STATES DEPARTMENT OF JUSTICE 950 PENNSYLVANIA AVENUE, NW |
| | WASHINGTON, DC 20530-0001 |
| Attorney Phone: | (202) 514-2217 |
| Email Address: | SUPREMECTBRIEFS@USDOJ.GOV |
| Firm Name: | ACTING SOLICITOR GENERAL |

## VIRGIN ISLANDS BAR ASSOCIATIONToggle Section

| | |
|---|---|
| Type: | OTHER |
| Attorney: | DWYER STENQUIST ARCE |
| Attorney Address: | 1650 FARNAM STREET |
| | THE OMAHA BUILDING |
| | OMAHA, NE 68102 |
| Attorney Phone: | (402) 346-6000 |
| Email Address: | DWYER.ARCE@KUTAKROCK.COM |
| Firm Name: | KUTAK ROCK LLP |

### DOCKET PROCEEDINGS (25)

| Date: | Entry #: | Description: | Date Docketed: | Party: |
|---|---|---|---|---|
| 01/25/2021 | | **Docket Entry:** PETITION DENIED. | | |
| 01/07/2021 | | **Docket Entry:** DISTRIBUTED FOR CONFERENCE OF 1/22/2021. | | |
| 01/06/2021 | | **Docket Entry:** REPLY OF PETITIONER STEVEN BAXTER FILED. (DISTRIBUTED). CERTIFICATE OF WORD COUNT | | View / Add to request |
| 01/06/2021 | | **Docket Entry:** REPLY OF PETITIONER STEVEN BAXTER FILED. (DISTRIBUTED). PROOF OF SERVICE | | View / Add to request |
| 01/06/2021 | | **Docket Entry:** REPLY OF PETITIONER STEVEN BAXTER FILED. (DISTRIBUTED). MAIN DOCUMENT | | View / Add to request |
| 12/16/2020 | | **Docket Entry:** MOTION TO DELAY DISTRIBUTION OF THE PETITION FOR A WRIT CERTIORARI GRANTED. THE CASE WILL BE DISTRIBUTED THURSDAY, JANUARY 7, 2021. | | |
| 12/15/2020 | | **Docket Entry:** MOTION OF PETITIONER TO DELAY DISTRIBUTION OF THE CASE UNDER RULE 15.5 FROM DECEMBER 23, 2020 TO JANUARY 6, 2021, SUBMITTED TO THE CLERK. MAIN DOCUMENT | | View / Add to request |
| 12/09/2020 | | **Docket Entry:** BRIEF OF RESPONDENT UNITED STATES IN OPPOSITION FILED. PROOF OF SERVICE | | View / Add to request |
| 12/09/2020 | | **Docket Entry:** BRIEF OF RESPONDENT UNITED | | View / Add to request |

STEVEN BAXTER V. UNITED STATES, 20-5133 (2020)

| | | | |
|---|---|---|---|
| | STATES IN OPPOSITION FILED. MAIN DOCUMENT | | |
| 10/29/2020 | **Docket Entry:** MOTION TO EXTEND THE TIME TO FILE A RESPONSE IS GRANTED AND THE TIME IS FURTHER EXTENDED TO AND INCLUDING DECEMBER 9, 2020. | | |
| 10/28/2020 | **Docket Entry:** MOTION TO EXTEND THE TIME TO FILE A RESPONSE FROM NOVEMBER 9, 2020 TO DECEMBER 9, 2020, SUBMITTED TO THE CLERK. MAIN DOCUMENT | View | Add to request |
| 10/09/2020 | **Docket Entry:** BRIEF AMICUS CURIAE OF VIRGIN ISLANDS BAR ASSOCIATION FILED. CERTIFICATE OF WORD COUNT | View | Add to request |
| 10/09/2020 | **Docket Entry:** BRIEF AMICUS CURIAE OF VIRGIN ISLANDS BAR ASSOCIATION FILED. PROOF OF SERVICE | View | Add to request |
| 10/09/2020 | **Docket Entry:** BRIEF AMICUS CURIAE OF VIRGIN ISLANDS BAR ASSOCIATION FILED. MAIN DOCUMENT | View | Add to request |
| 10/02/2020 | **Docket Entry:** MOTION TO EXTEND THE TIME TO FILE A RESPONSE IS GRANTED AND THE TIME IS EXTENDED TO AND INCLUDING NOVEMBER 9, 2020. | | |
| 09/30/2020 | **Docket Entry:** MOTION TO EXTEND THE TIME TO FILE A RESPONSE FROM OCTOBER 9, 2020 TO NOVEMBER 9, 2020, SUBMITTED TO THE CLERK. MAIN DOCUMENT | View | Add to request |
| 09/09/2020 | **Docket Entry:** RESPONSE REQUESTED. (DUE OCTOBER 9, 2020) | | |
| 08/06/2020 | **Docket Entry:** DISTRIBUTED FOR CONFERENCE OF 9/29/2020. | | |
| 07/31/2020 | **Docket Entry:** WAIVER OF RIGHT OF RESPONDENT UNITED STATES TO RESPOND FILED. MAIN DOCUMENT | View | Add to request |
| 07/14/2020 | **Docket Entry:** PETITION FOR A WRIT OF CERTIORARI AND MOTION FOR LEAVE TO PROCEED IN FORMA PAUPERIS FILED. | View | Add to request |

| | | |
|---|---|---|
| | (RESPONSE DUE AUGUST 21, 2020). PROOF OF SERVICE | |
| 07/14/2020 | **Docket Entry:** PETITION FOR A WRIT OF CERTIORARI AND MOTION FOR LEAVE TO PROCEED IN FORMA PAUPERIS FILED. (RESPONSE DUE AUGUST 21, 2020). CERTIFICATE OF WORD COUNT | View    Add to request |
| 07/14/2020 | **Docket Entry:** PETITION FOR A WRIT OF CERTIORARI AND MOTION FOR LEAVE TO PROCEED IN FORMA PAUPERIS FILED. (RESPONSE DUE AUGUST 21, 2020). APPENDIX | View    Add to request |
| 07/14/2020 | **Docket Entry:** PETITION FOR A WRIT OF CERTIORARI AND MOTION FOR LEAVE TO PROCEED IN FORMA PAUPERIS FILED. (RESPONSE DUE AUGUST 21, 2020). APPENDIX | View    Add to request |
| 07/14/2020 | **Docket Entry:** PETITION FOR A WRIT OF CERTIORARI AND MOTION FOR LEAVE TO PROCEED IN FORMA PAUPERIS FILED. (RESPONSE DUE AUGUST 21, 2020). PETITION | View    Add to request |
| 07/14/2020 | **Docket Entry:** PETITION FOR A WRIT OF CERTIORARI AND MOTION FOR LEAVE TO PROCEED IN FORMA PAUPERIS FILED. (RESPONSE DUE AUGUST 21, 2020). MOTION FOR LEAVE TO PROCEED IN FORMA PAUPERIS | View    Add to request |

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

*attachment #1*

Greetings,

I hope this letter finds you well

In response to the court ruling dated on November 13, 2024 for the case 24-00086 the plaintiff, Byungmin Chae, would like to bring to your attention the following discoveries

1. Eligibility

   The defendant was supposed to confer and file with the clerk of the court no later than August 5, 2024 the proposed scheduling order. And in the event that the parties were unable to agree each party should file a proposed scheduling order no later than August 5, 2024 and schedule a conference call with chambers by contacting the case manager by August 6, 2024. The plaintiff followed the guidelines of the court as noted while the defendant failed to submit any of those court-mandated documents by the deadline assigned from the court and did not comply with the court order. This is the obvious act of the ignorance and disregard to the court order and the defendant lost its privilege of defending its claim in the course of the filed action and cannot be treated with the same in the case. Please see the attachment #1

2. The deficiency in the claim preclusion requirements

   Out of three requirements for the claim preclusion I agree with what the court stated the first requirement "(1) the parties in both suits are identical" and second requirement "(2) the first suit reached a final judgment on the merits".  However, the third requirement "the second suit is based on the same set of the transactional facts as in the first suit" needs to be reviewed in the following respects

   1) In the second suit the plaintiff paid the detailed attention to the discrepancy of the 19 CFR 145.2 mail subject to customs examination.

**§ 145.2 Mail subject to Customs examination.**

(a) *Restrictions.* Customs examination of mail as provided in paragraph (b) of this section is subject to the restrictions and safeguards relating to the opening of letter class mail set forth in § 145.3.

(b) *Generally.* All mail arriving from outside the Customs territory of the United States which is to be delivered within the Customs territory of the United States and all mail arriving from outside the U.S. Virgin Islands which is to be delivered within the U.S. Virgin Islands, is subject to Customs examination, except:

(1) Mail known or believed to contain only official documents addressed to officials of the U.S. Government;

(2) Mail addressed to Ambassadors and Ministers (Chiefs of Diplomatic Missions) of foreign countries; and

(3) Letter class mail known or believed to contain only correspondence or documents addressed to diplomatic missions, consular posts, or the officers thereof, or to international organizations designated by the President as public international organizations pursuant to the International Organizations Act (see § 148.87(b) of this chapter). Mail, other than letter class mail, addressed to the designated international organizations is subject to Customs examination except where the organization certifies under its official seal that the mail contains no dutiable or prohibited articles. Any Customs examination made shall, upon request of the addressee international organization, take place in the presence of an appropriate representative of that organization.

The plaintiff pointed out the first discrepancy in the general statement of (b) as highlighted in regards to the definition of the customs territory which did not include the U.S. Virgin Islands. This discrepancy was not covered in my first case with the court of international trade and **presented in the second suit for the first time**.

2) The definition of the U.S. government in insular possession in 10 CFR 145.2 (b) (1) as below **was not mentioned in the first case** with the court of the international trade at all

**§ 145.2 Mail subject to Customs examination.**

(a) *Restrictions.* Customs examination of mail as provided in paragraph (b) of this section is subject to the restrictions and safeguards relating to the opening of letter class mail set forth in § 145.3.

(b) *Generally.* All mail arriving from outside the Customs territory of the United States which is to be delivered within the Customs territory of the United States and all mail arriving from outside the U.S. Virgin Islands which is to be delivered within the U.S. Virgin Islands, is subject to Customs examination, except:

(1) Mail known or believed to contain only official documents addressed to officials of the U.S. Government;

(2) Mail addressed to Ambassadors and Ministers (Chiefs of Diplomatic Missions) of foreign countries; and

(3) Letter class mail known or believed to contain only correspondence or documents addressed to diplomatic missions, consular posts, or the officers thereof, or to international organizations designated by the President as public international organizations pursuant to the International Organizations Act (see § 148.87(b) of this chapter). Mail, other than letter class mail, addressed to the designated international organizations is subject to Customs examination except where the organization certifies under its official seal that the mail contains no dutiable or prohibited articles. Any Customs examination made shall, upon request of the addressee international organization, take place in the presence of an appropriate representative of that organization.

**§ 7.2 Insular possessions of the United States other than Puerto Rico.**

(a) Insular possessions of the United States other than Puerto Rico are also American territory but, because those insular possessions are outside the customs territory of the United States, goods

Once again let me remind the court of appeals for the federal circuit that my case with the court of international trade mainly concerns the applicability of the regulation and is not based on the same set of transactional facts as noted in the first case. And this is why I claim the third requirement for the claim preclusion does not form the third requirement to qualification. I am well aware that this case has been the time consuming process for the last 6 years but I would appreciate your assistance to bring this matter to the justice.

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **BYUNGMIN CHAE,**<br><br>    Plaintiff,<br><br>v.<br><br>**UNITED STATES,**<br><br>    Defendant. | Before: Timothy M. Reif, Judge<br><br>Court No. 24-00086 |

### ORDER

Upon consideration of defendant's motion to stay the proceedings pending the resolution of defendant's motion to dismiss, and in view of other papers and proceedings had herein, it is hereby

**ORDERED** that defendant's motion t[...]                                    :D.

*[handwritten annotation: defendant failed to Submit !!]*

Dated: August 13, 2024
      New York, New York

Case 1:24-cv-00086-TMR   Document 18   Filed 01/15/25 ~~my position to or Res Judicata~~

**CASE NO. 1:24-CV-00086-TMR / BYUNGMIN CHAE V. UNITED STATES[1]**

**Case Initiating Documents**

Plaintiff commenced the case with summons (letter)

Issue: Question 27 of 04/2018 CBLE

> **27. Which of the following mail articles are not subject to examination or inspection by Customs?**
>
> A. Bona-fide gifts with an aggregate fair retail value not exceeding $800 in the country of shipment
> B. Mail packages addressed to officials of the U.S. Government containing merchandise
> C. Diplomatic pouches bearing the official seal of France and certified as only containing documents
> D. Personal and household effects of military and civilian personnel returning to the United States upon the completion of extended duty abroad
> E. Plant material imported by mail for purposes of immediate exportation by mail

P's argument: controversial issues:

❖ Examination answer is focused only on customs territory of the US. 19 CFR 145.2
❖ USVI is outside of the scope of 19 CFR 145.2
❖ US Govt. officials in the U.S. territories are outside of the scope of 19 CFR 145.2

**D's Motion to Extend Time (Doc. No. 5)**

P's action is barred by doctrine of *stare decisis*:

❖ CIT Ruled that CBP's decision to deny credit for Question No. 27 was supported by substantial evidence. Chae v. Yellen, 579 F. Supp. 3d 1343, 1361 (Ct. Int'l Trade 2022) ( . . . "Customs' decision to deny plaintiff credit for question 27 was supported by substantial evidence.")
❖ On appeal, the U.S. Court of Appeals for the Federal Circuit (Federal Circuit) affirmed this Court's decision. Chae v. Yellen, 2023 WL 3072385 (Fed. Cir. Apr. 25, 2023) ("We affirm the CIT's decision on Questions 27 and 33."), cert denied, 144 S. Ct. 347 (2023).

**D's Motion to Dismiss (Doc. No. 7) → Rule 12(b)(6)**

*Res Judicata / Claim Preclusion:*

❖ This action involves the same parties and the same claim as in Chae I, and there has been two valid judgments on that claim. Consequently, plaintiff's action is barred by the doctrine of res judicata

---

[1] https://ecf.cit.uscourts.gov/cgi-bin/DktRpt.pl?707984154259994-L_1_0-1

Law cited by Def.:

❖ A subsequent lawsuit is barred by the doctrine of res judicata or claim preclusion "if there has been prior litigation (1) involving the same claims or cause of action, (2) between the same parties or their privies, and (3) there has been a final, valid judgment on the merits, (4) by a court of competent jurisdiction." Smalls v. United States, 471 F.3d 186, 192 (D.C. Cir. 2006).

❖ "Under the doctrine of res judicata [claim preclusion], a judgment on the merits in a prior suit bars a second suit involving the same parties or their privies based upon the same claim or cause of action." Golden Pac. Bancorp v. United States, 15 F.3d 1066, 1071 (Fed. Cir. 1994) (citing 1B James W. Moore et al., Moore's Federal Practice ¶ 0.401[1] (2d ed.1993)).

❖ "[R]es judicata (claim preclusion) bars relitigation not only of matters determined in a previous litigation but also ones that a party could have raised." Natural Res. Def. Council v. Thomas, 838 F.2d 1224, 1252 (D.C. Cir. 1988).

> This Court issued a final valid judgment affirming CBP's decision on Question No. 27, and the Federal Circuit affirmed that judgment. Accordingly, plaintiff's Complaint is barred by res judicata and should be dismissed.

**Stare Decisis:**

❖ CIT is bound by the Federal Circuit's decision on Question No. 27 in Chae I.

Law cited by Def.:

❖ The doctrine of stare decisis compels a lower court to abide by the legal decisions of higher courts in the same jurisdiction. Mendenhall v. Cedarapids, Inc., 5 F.3d 1557, 1570 (Fed. Cir. 1993).

❖ "Adherence to precedent is 'a foundation stone of the rule of law.'" Kisor v. Wilkie, 588 U.S. 558, 586 (2019) (citing Michigan v. Bay Mills Indian Community, 572 U. S. 782, 798 (2014)).

❖ The doctrine of stare decisis "promotes the evenhanded, predictable, and consistent development of legal principles, fosters, reliance on judicial decision, and contributes to the actual and perceived integrity of the judicial process." Payne v. Tenn, 501 U.S. 808, 827 (1991).

❖ Any departure from the doctrine of stare decisis "demands 'special justification'—something more than 'an argument that the precedent was wrongly decided.'" Kisor, 588 U.S. at 587 (citing Halliburton Co. v. Erica P. John Fund, Inc., 573 U.S. 258, 266 (2014)).

> Federal Circuit held that "CBP's decision to deny Mr. Chae credit for his answer to Question 27 is supported by substantial evidence, and thus the CIT's decision as to this question is affirmed."

### D's Motion to Stay (Doc. No. 10)

P's action is barred by doctrine of *res judicata*:

❖ this action involves the same parties and the same claim as in Chae I[2]
❖ there has been two valid judgments on that claim

---

[2] Chae v. Yellen, 579 F. Supp. 3d 1343 (Ct. Int'l Trade 2022), aff'd, Chae v. Yellen, 2023 WL 307285 (Fed. Cir. Apr. 25, 2023)

### Opposition to Def.'s Motion to Dismiss (Doc. No. 11)

P reiterates:

- ❖ the deficiency of consistency or the "discrepancy" in the 19 CFR 145.2(b) with respect to customs territory
- ❖ possibility of the exception in the regulation which lead the plaintiff to believe in the vulnerability of the regulation
- ❖ Regulation is itself improperly written.

Additional Claim:

- ❖ Def. failed to comply with the scheduling order

### Conf. with the Judge (Doc. No. 13)

P goes for confusing regulation, making it invalid

Judge acknowledges the argument, but attempts to pin P as to why that "new" argument was not brought in to the Court's attention in the first place.

Court narrowed the issue to the following:

- ❖ Whether the challenge you're bringing to question 27 now, could have been brought when you first brought this case to the Court

### Def.'s Reply Brief in Supp. of Mot. to Dismiss

Narrows the issue to 19 CFR 145.2:

- ❖ Specifically, in this action, plaintiff claims, for the first time, that the regulation that provided the basis for CBP's response to Question No. 27, 19 C.F.R. § 145.2, is flawed, and therefore plaintiff should be granted credit for that question.
- ❖ Plaintiff cannot avoid the preclusive effect of *res judicata* as the doctrine applies to arguments or claims that were or *could have been raised in the prior action*.
- ❖ Plaintiff could have raised concerns about the propriety of section 145.2 in Chae I.

Cites the Following Law:

- ❖ The doctrine of res judicata bars a subsequent lawsuit "if there has been prior litigation (1) involving the same claims or cause of action, (2) between the same parties or their privies, and (3) there has been a final, valid judgment on the merits, (4) by a court of competent jurisdiction." Smalls v. United States, 471 F.3d 186, 192 (D.C. Cir. 2006).
- ❖ Under the doctrine of res judicata, a final judgment on the merits of an action precludes the parties from "relitigating issues that were or could have been raised in that action." Federated Dep't Stores, Inc. v. Moitie, 452 U.S. 394, 398 (1981); Allen v. McCurry, 449 U.S. 90, 94 (1980) (citing Cromwell v. Count of Sac, 94 U.S. 351, 352 (1876)).

Gov. admits that P' could have raised that issue before CAFC:

❖ Plaintiff also had the opportunity to present arguments in support of his Federal Circuit appeal.

**Court's Order Dimsissing the Action (Doc. No. 15)**

**Holding:** Because plaintiff's arguments in the instant action could have been raised in Chae I, plaintiff's claim is barred by claim preclusion.

**Law:**

❖ Under the doctrine of claim preclusion, "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." Allen v. McCurry, 449 U.S. 90, 94 (1980) (citing Cromwell v. Cnty. of Sac, 94 U.S. 351, 352 (1876)); Brown v. Felsen, 442 U.S. 127, 131 (1979) (("Res judicata prevents litigation of all grounds for, or defenses to, recovery that were previously available to the parties, regardless of whether they were asserted or determined in the prior proceeding.")

❖ Golden Pac. Bancorp. v. United States, 15 F.3d 1066, 1071 (Fed. Cir. 1994)

❖ The party asserting claim preclusion is required to show that: (1) the parties in both suits are identical; (2) the first suit reached a final judgment on the merits; and (3) the second suit is based on the same set of transactional facts as in the first suit. Jet, Inc. v. Sewage Aeration Sys., 223 F.3d 1360, 1362 (Fed. Cir. 2000) (citing Parklane Hosiery Co. v. Shore, 439 U.S. 322, 326 n.5 (1979)); see also Young Eng'rs, Inc. v. U.S. Int'l Trade Comm'n, 721 F.2d 1305, 1314 (Fed. Cir. 1983) (citing Restatement (Second) of Judgments § 13 (1982)); Apotex, Inc. v. FDA, 393 F.3d 210, 217 (D.C. Cir. 2004) ("[A] judgment on the merits in a prior suit bars a second suit involving identical parties . . . based on the same cause of action.").

❖ A transaction is characterized as having "the same, or nearly the same factual allegations" or "the same nucleus of operative facts." Herrmann v. Cencom Cable Assocs., Inc., 999 F.2d 223, 226 (7th Cir. 1993) (first quoting Parsons Steel, Inc. v. First Ala. Bank, 474 U.S. 518, 521 (1986); and then quoting Lane v. Peterson, 899 F.2d 737, 744 (8th Cir. 1990)).

❖ New events or facts arising after the first suit are not part of the same "operative nucleus of facts." Ammex, Inc. v. United States, 334 F.3d 1052, 1057 (2003) (citing Herrmann, 999 F.2d at 226); see also E.I du Pont de Nemours & Co. v. United States, 32 CIT 476, 489, 561 F. Supp. 2d 1320, 1331 (2008) (explaining that claim preclusion did not apply because the first suit concerned "a judicial challenge to a different administrative determination by Customs" than in the second suit).

❖ Claim preclusion does not bar claims that could not have been anticipated when the first suit was filed or "would have been utterly impracticable" to raise at the time. U.S. Indus., Inc. v. Blake Const. Co., 765 F.2d 195, 205 n.21 (D.C. Cir. 1985); see also Apotex, 393 F.3d at 212 (acknowledging how "there has been no intervening change in the law[,] and there have been no material changes in the facts").

**Application:**

❖ Plaintiff does not provide to the court any new facts that arose after his initial action reached a final judgment.

❖ Plaintiff only supplements his earlier arguments in Chae I.

**Previous v. Present Claim**

In Chae I, plaintiff presented an argument concerning the definition of mail packages. See Chae I, 46 CIT at , 579 F. Supp. 3d at 1359 (citing 19 C.F.R. § 145.2(b); 19 C.F.R. § 145.37).

In the instant case, plaintiff attempts to explain the inconsistent definition of "Customs territory." Compl. at 1; see also 19 C.F.R. § 145.2(b); 19 C.F.R. § 101.1.

**RES JUDICATA (CLAIM PRECLUSION) PRINCIPLES**

Res judicata bars not only those claims that were litigated but also those that could have been litigated.[1]

Res judicata applies where: (1) the parties were identical; (2) the subject matter was identical; (3) the issues were the same and related to the subject matter; and (4) the capacities of the persons were identical in reference to both the subject matter and the issues between them.[2]

- ❖ Concept of the same issues depends on level of generality
- ❖ CIT addresses them under the rubic of "the same set of transactional facts as in the first suit."

For the doctrine of res judicata to apply: (1) the parties in the new litigation are the same or in privity with the parties to the earlier dispute; (2) the claim[3] presented in the current action is identical to the one determined in the prior adjudication; and (3) there was a valid final judgment on the merits.[4]

- ❖ Concept of identical claim

Within the general doctrine of res judicata, there are two principal categories or branches: (1) claim preclusion also known as res judicata; and (2) issue preclusion also known as collateral estoppel.[5]

Res judicata (or claim preclusion) and collateral estoppel (or issue preclusion) are related but independent preclusion concepts that involve distinct questions of law.[6]

One court explains that under "claim preclusion" a judgment forecloses litigation of a matter that should have been advanced in an earlier suit, while under "issue preclusion" a judgment forecloses relitigation of a matter that has been litigated and decided.[7]

| Res Judicata (Claim Preclusion) | Collateral Estoppel (Issue Preclusion) |
| --- | --- |
| Forecloses litigation of the matter that should have been advanced in an earlier suit | Forecloses relitigation of a matter that has been litigated and decided |
| | Narrower principle then res judicata |
| | One who has actually litigated an issue should not be allowed to relitigate it |
| | *See* 46 Am. Jur. 2d Judgments § 468 for elements |

- ❖ It may be advantageous for client to focus the argument on the Courts incorrect reading of govt.'s spin of client's claim as res judicata, while in fact they were discussin collateral estoppel.

**Res Judicata Limitation: Interests of Justice**

---

[1] 82 Am. Jur. 2d Wrongful Discharge § 180
[2] 46 Am. Jur. 2d Judgments § 442
[3] Claim is defined as "A demand for money, property, or a legal remedy to which one asserts a right; esp., the part of a complaint in a civil action specifying what relief the plaintiff asks for." CLAIM, Black's Law Dictionary (12th ed. 2024)
[4] 46 Am. Jur. 2d Judgments § 442
[5] 46 Am. Jur. 2d Judgments § 443
[6] 46 Am. Jur. 2d Judgments § 443
[7] 46 Am. Jur. 2d Judgments § 443

The doctrine of res judicata is not absolute; a court should not adhere to the doctrine where its application would work an injustice.[8]

❖ Situations may arise which call for exceptions to the application of the doctrine, such as where the party against whom the earlier decision is asserted did not have a full and fair opportunity to litigate that issue in the earlier case.[9]
  → Effective legal assistance (conf. call, where Judge thought that the counsel for client was very good).

The judgment in the first action was plainly inconsistent with the fair and equitable implementation of a statutory or constitutional scheme.[10]

### Res Judicata Limitation: Strict Application

Claim preclusion is strictly applied.[11]

❖ Problem: authority varies on that point.  *See* 46 Am. Jur. 2d Judgments § 449.

### Res Judicata Problem: Applies Whether Relitigation of the Claim Raises the Same Issues as the Earlier Suit

Res judicata or claim preclusion thus prevents a litigant from reasserting or relitigating a claim that has already been decided on the merits, by a court of competent jurisdiction, whether relitigation of the claim raises the same issues as the earlier suit.[12]

❖ Claim preclusion generally refers to the effect of a prior judgment in foreclosing successive litigation of the very same claim, whether or not relitigation of the claim raises the same issues as the earlier suit. Issue preclusion generally refers to the effect of a prior judgment in foreclosing successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment, whether or not the issue arises on the same or a different claim.[13]

### Res Judicata Problem: Should Have Been Litigated

Res judicata or claim preclusion bars the litigation of not only issues that were actually litigated, but also issues that could have been litigated, might have been litigated, or should have been litigated in the

---

[8] 46 Am. Jur. 2d Judgments § 449 citing Crocker Investments, Inc. v. Statesman Life Ins. Co., 515 So. 2d 1305 (Fla. 3d DCA 1987).
[9] 46 Am. Jur. 2d Judgments § 449, citing Allen v. McCurry, 449 U.S. 90, 101 S. Ct. 411, 66 L. Ed. 2d 308 (1980); People v. Moore, 138 Ill. 2d 162, 149 Ill. Dec. 278, 561 N.E.2d 648 (1990); Jordan v. Lamb, 392 N.W.2d 607 (Minn. Ct. App. 1986).
[10] Restatement (Second) of Judgments § 26 (1982)
[11] 46 Am. Jur. 2d Judgments § 449, citing Gunter v. Winders, 253 N.C. 782, 117 S.E.2d 787 (1961).
[12] 46 Am. Jur. 2d Judgments § 452
[13] New Hampshire v. Maine, 532 U.S. 742, 748–49, 121 S. Ct. 1808, 1814, 149 L. Ed. 2d 968 (2001).

original suit or former proceedings. In this respect, res judicata, or claim preclusion, is a broader remedy than collateral estoppel, which applies only to issues that were actually litigated.[14]


### Res Judicata: Nucleus of Operative Facts

CIT cited to E.I. du Pont de Nemours & Co. v. U.S., which held that res judicata is not applicable to the same drawback entry that arose from a judicial challenge to a different administrative determination by CBP

Claim I: Denial of protest for reliquidation of drawback entry (Customs is instructed to approve the proposed drawback contract as revised by DuPont on or about March 4, 1994, reliquidate the drawback entry, and pay DuPont's drawback claim)

Claim II: Denial of protest challenging the issues of: Inconsistent application of the drawback statute; Application of relative value in apportionment, not relative weight

❖ Look for determinations on prior CBLEs involving the same question.


### Earlier Decision of CIT: Chae v. Yellen[15]

#### B. Question 27

Second, plaintiff appeals Customs' decision to deny plaintiff credit for question 27 on the April 2018 exam. *See* Pl. Br. at 5. Question 27 states:

Which of the following mail articles are not subject to examination or inspection by Customs?

A. Bona-fide gifts with an aggregate fair retail value not exceeding $800 in the country of shipment

B. Mail packages addressed to officials of the U.S. Government containing merchandise

C. Diplomatic pouches bearing the official seal of France and certified as only containing documents

D. Personal and household effects of military and civilian personnel returning to the United States upon the completion of extended duty abroad

E. Plant material imported by mail for purposes of immediate exportation by mail

#### 1. Positions of the parties

Customs designated answer choice (C) as the correct response to question 27. See Def. Resp. Br. at 10. Plaintiff selected answer choice (B), but does not contest that answer choice (C) is correct. See Pl. Br. at

---

[14] 46 Am. Jur. 2d Judgments § 454
[15] Chae v. Yellen, 579 F. Supp. 3d 1343, 1358–59 (Ct. Int'l Trade 2022), aff'd, No. 2022-2017, 2023 WL 3072385 (Fed. Cir. Apr. 25, 2023)

6. Accordingly, the parties dispute only whether Customs' decision to deny plaintiff credit for his selection of answer choice (B) was supported by substantial evidence. See id.; Def. Resp. Br. at 11-12.

Plaintiff advances two arguments with respect to question 27. First, plaintiff contends that question 27 is ambiguous because the question does not indicate "where the mail packages are coming from." Pl. Br. at 6. Answer choice (B) points to "[m]ail packages addressed to officials of the U.S. Government containing merchandise." Am. Admin. R., Ex. N, at *13. Plaintiff argues that if the mail packages are sent from a domestic source, then the packages described in this answer choice would not be subject to examination or inspection by Customs. See Pl. Br. at 6. Without this information, however, plaintiff argues that the question is ambiguous. See id.

Second, plaintiff contends that answer choice (B) also is correct. See id.; Pl. Reply Br. at 6. In support of this contention, plaintiff points to two of Customs' regulations. See Pl. Br. at 6. To start, 19 C.F.R. § 145.2(b)(1) provides that "[m]ail known or believed to contain only official documents addressed to officials of the U.S. Government" is not "subject to Customs examination." Plaintiff next turns to 19 C.F.R. § 145.37. See Pl. Reply Br. at 6. This regulation provides that certain "[b]ooks ... and engravings, etchings, and other articles ... shall be passed free of duty without issuing an entry when they are addressed to the Library of Congress or any department or agency of the U.S. Government." Id. (quoting 19 C.F.R. § 145.37(b)). Plaintiff contends that the articles described in 19 C.F.R. § 145.37(b) constitute "[m]ail packages addressed to officials of the U.S. Government containing merchandise" that shall be passed free of duty. See id.; Am. Admin. R., Ex. N, at *13. On this basis, plaintiff argues that answer choice (B) is correct. See Pl. Br. at 6; Pl. Reply Br. at 6-7.

Defendants contest both of plaintiff's arguments. See Def. Resp. Br. at 10-12. First, defendants challenge plaintiff's contention that the mail articles described in question 27 might be sent from a domestic source. See id. at 11-12. According to defendants, question 27 "reasonably assumes that all mail articles identified are imported into the United States" because "[i]f the merchandise was not imported ... then custom laws would not apply" to the question. Id. at 11. Defendants argue that the question and answer choice (B) as drafted reasonably "test the [applicant's] ability to distinguish between imports that require examination or inspection and those that do not." Id.

Second, defendants challenge plaintiff's reliance upon 19 C.F.R. § 145.2(b)(1) and 19 C.F.R. § 145.37. See id. at 10-11. With respect to 19 C.F.R. § 145.2(b)(1), defendants note that this provision excepts from examination by Customs "[m]ail known or believed to contain only official documents addressed to officials of the U.S. Government." See id. at 11 (citing 19 C.F.R. § 145.2(b)(1)) (emphasis in original). According to defendants, the plain language of this provision contradicts plaintiff's conclusion that "[m]ail packages addressed to officials of the U.S. Government containing merchandise" are not subject to examination or inspection by Customs. Am. Admin. R., Ex. N, at *13 (emphasis supplied); see Def. Resp. Br. at 11.

Defendants then turn to 19 C.F.R. § 145.37. See Def. Resp. Br. at 11. Defendants raise two points with respect to this regulation. First, defendants note that 19 C.F.R. § 145.37(c) distinguishes mail articles that contain "only official documents" from articles that contain "merchandise." See id. According to defendants, this regulation provides that articles that contain "only official documents[ ] shall be passed free of duty without issuing an entry." 19 C.F.R. § 145.37(c). In contrast, defendants note that articles that contain "merchandise[ ] shall be treated in the same manner as other mail articles of merchandise." Id. Accordingly, defendants assert that 19 C.F.R. § 145.37(c) indicates that articles that contain

"merchandise" shall be subject to examination by Customs. See Def. Resp. Br. at 11. On this basis, defendants contend that answer choice (B) is not correct. See id. at 10-12.

In the alternative, defendants note that 19 C.F.R. § 145.37 does not concern "Customs' examination" of the subject articles, but rather concerns how the articles "should be treated ... for duty purposes." Oral Arg. Tr. at 27:12-16. According to defendants, the articles described in 19 C.F.R. § 145.37(b) and (c) "still would be subject to Customs' examination" even if those articles are "passed free of duty." Id. at 27:13-14; 19 C.F.R. § 145.37(b)-(c). On this basis, defendants contend that 19 C.F.R. § 145.37 is not responsive to question 27 and consequently does not support plaintiff's selection of answer choice (B). See Def. Resp. Br. at 11; Oral Arg. Tr. at 27:12-16.

Accordingly, defendants argue that Customs' decision to deny plaintiff credit for question 27 was supported by substantial evidence. See Def. Resp. Br. at 12.

2. Analysis

Customs' decision to deny plaintiff credit for question 27 was supported by substantial evidence.

To start, Customs determined reasonably that question 27 presumes that the mail articles described in the question are imported into the United States. This presumption is reasonable based on the fact that the CBLE is designed to examine an applicant's ability to interpret and apply "customs and related laws, regulations and procedures." Rudloff, 19 C.I.T. at 1249 (citing 19 U.S.C. § 1641(b)(2)). Without the presumption that the mail articles described in question 27 are imported into the United States, the foregoing authorities would not apply to this question. In view of the purpose of the CBLE, Customs engaged in "reasoned decision-making" in concluding that question 27 is drafted in a manner that indicates Customs' intention to examine whether an applicant is able to distinguish imports that are subject to examination or inspection by Customs from imports that are not subject to such examination or inspection. Harak, 30 C.I.T. at 919. For this reason, the court accords Customs a "measure of deference" with respect to Customs' "design" of question 27 and concludes that the question is not ambiguous. Dunn-Heiser, 29 C.I.T. at 556, 374 F. Supp. 2d at 1280.

Next, Customs determined reasonably that 19 C.F.R. § 145.2(b)(1) and *1361 19 C.F.R. § 145.37 do not support plaintiff's conclusion that answer choice (B) is correct. 19 C.F.R. § 145.2(b)(1) excepts from examination by Customs "[m]ail known or believed to contain only official documents addressed to officials of the U.S. Government." 19 C.F.R. § 145.2(b)(1) (emphasis supplied). This regulation does not except from examination or inspection by Customs the articles described in answer choice (B) — "[m]ail packages addressed to officials of the U.S. Government containing merchandise." Am. Admin. R., Ex. N, at *13 (emphasis supplied). Further, "official documents" under 19 C.F.R. § 145.2(b)(1) do not constitute "merchandise" within the meaning of Customs' regulations. See, e.g., 19 C.F.R. § 145.37(c) (distinguishing mail articles that contain "official documents" from mail articles that contain "merchandise"). Accordingly, the plain language of 19 C.F.R. § 145.2(b)(1) contradicts plaintiff's argument with respect to his selection of answer choice (B).

Turning to 19 C.F.R. § 145.37, this provision is not responsive to question 27, which instructs the applicant to determine "[w]hich of the following mail articles are not subject to examination or inspection by Customs." Am. Admin. R., Ex. N, at *13 (emphasis supplied). 19 C.F.R. § 145.37 does not address whether certain mail articles are subject to "examination" or "inspection" by Customs. Rather,

this provision addresses whether the articles "shall be passed free of duty without issuing an entry." 19 C.F.R. § 145.37(b)-(c). Whether an article "shall be passed free of duty" is a distinct question from whether an article "shall be subject to examination or inspection by Customs." Id.; Am. Admin. R., Ex. N, at *13. On this basis, 19 C.F.R. § 145.37 does not support plaintiff's selection of answer choice (B).

Accordingly, Customs' decision to deny plaintiff credit for question 27 was supported by substantial evidence.

### Res Judicata: Changed Circumstances

*United States v. Baxter*: 3d Cir. upheld USVI/Mainland border searches in 2020

RECEIVED & FILED

2025 JAN 13  P 2: 50

U.S. COURT OF
INTERNATIONAL TRADE
OFFICE OF THE CLERK

RECEIVED & FILED

2025 JAN 21  P 5: 22

U.S. COURT OF
INTERNATIONAL TRADE
OFFICE OF THE CLERK